[Civ. No. 8139. Third Dist. Nov. 30, 1953.]

STOCKTON THEATRES, INC., Plaintiff and Appellant, v. EMIL PALERMO, Defendant and Appellant; FORREST E. MACOMBER, Respondent.

618

Freed, Gebauer & Freed for Plaintiff and Appellant.

Smith & Zeller and John A. Montgomery, Jr., for Defendant and Appellant.

VAN DYKE, P. J. — On November 20, 1944, Stockton Theatres, Inc., a corporation, whose capital stock was almost wholly owned by Japanese nationals, was in possession of certain real property in Stockton, California, upon which it was conducting, in a building designed and equipped for that purpose, a theater business. Its lease antedated the abrogation by the United States of the treaty with Japan, which had followed the beginning of war between the two countries. On June 5, 1944, Emil Palermo, the owner of said theater property, began an action against Stockton Theatres, Inc., in the form of an action for declaratory relief. He alleged that a controversy existed between the parties as to the validity of the lease in that he contended, and the theatre company denied, that the abrogation of the treaty had terminated the lease. The history of the litigation so begun is sufficiently set forth in the Supreme Court decision reported in 32 Cal.2d at page 53 et seq. [195 P.2d 1]. It is sufficient to say here that on June 11, 1945, a judgment was made and entered by the trial court in the cause, declaring the lease to be void as being in violation of California law governing the ownership and leasing of property by aliens ineligible to citizenship. Immediately Palermo began a second action against the theatre company based on alleged unlawful detention of the real property and on December 1st following he secured a favorable judgment in that action. Pursuant to court order he was placed in possession of the real property and maintained this possession until August 11, 1948. The theatre company had in proper time appealed from both

judgments and both judgments were reversed. Since the only issue tendered in the declaratory relief action was the effect upon the lease of the treaty abrogation it followed that the filing of the remittitur ended the litigation as to that issue and had the effect of adjudicating that the lease was valid and that under it the theatre company was entitled to possession as a tenant. The judgment in the unlawful detainer action depended upon the validity of the declaratory relief decree.

Palermo turned back to the theatre company the possession of the real property and likewise returned to it certain personal property, consisting of theater seats, projection machines, screens and other theater paraphernalia. This personal property Palermo had caused to be sold under writ of execution issued in the unlawful detainer suit, the judgment therein having decreed that in addition to the possession of the real property he recover a sum of money from the theatre company. At this execution sale one Rowan purchased the personal property and later purported to rent it to Palermo in place in the theater as it was when he bought it. Palermo thus restored to the theatre company the real and personal property which he had come into possession of through the two judgments he had secured against his tenant. The theatre company, deeming that restitution to which it was entitled was still incomplete, brought this action for further recovery. During his possession, and by use of the real and personal property, Palermo had conducted a theater business and by this action the theatre company asked that he be compelled to account to it for the income he had derived therefrom. Responsive to this demand, the trial court took an account and as an end result adjudged that the theatre company recover from Palermo the sum of $13,658.75. Both parties to the action have appealed.

A person whose property has been taken under a judgment "is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable." (Rest. Law of Restitution, § 74.)

"The law proceeds upon the theory that, in equity, the party who receives money or property in good faith under an erroneous judgment, thereafter reversed, should be required to restore what he has received, and not upon the theory of a supposed wrong committed. Restitution must be made of all that was received under the erroneous judgment, but no further liability should be imposed. After reversal

the respondent stands in the position of a trustee for the appellant of the property obtained under the judgment. He must handle that property as an ordinarily prudent man of business would, and is not chargeable with more than he received. Neither is he liable for losses if he acted in good faith and with common skill, prudence, and diligence. But if he converts the property to his own use, he is liable for its value at the time of the conversion, with interest.'' (4 Cal.Jur.2d ''Appeal and Error'' § 676.)

''. . . Where a judgment or decree of an inferior court is reversed by a final judgment on appeal, a party is in general entitled to restitution of all the things lost by reason of the judgment in the lower court; and, accordingly, the courts will, where justice requires it, place him as nearly as may be in the condition in which he stood previously. . . . The restitution may be directed and provided for in the original action itself (Code Civ. Proc., sec. 957), or may, as here, be sought in a separate action instituted for that purpose. . . . In such action the defendant must account for the property received under the judgment which has been reversed and the rule governing the extent of his liability is that applicable to a trustee, . . . 'The general doctrine being that trustees ought to conduct the business of the trust in the same manner as an ordinarily prudent man of business would conduct his own, they will not be chargeable with more than they have received nor held responsible for losses that may arise, when they have acted in good faith and with common skill, prudence and diligence.' '' (*Ward* v. *Sherman,* 155 Cal. 287, 291 [100 P. 864].)

 The foregoing was said in a case wherein under a judgment later reversed possession had been given of a cattle ranch, together with the cattle, horses, mules, wagons, harness, farm tools and machinery thereon and which possession had endured for approximately four years before the judgment was reversed. Our Supreme Court approved the taking of an account respecting the cattle business which the judgment holder had conducted thereon after being placed in possession.

We will treat first of the appeal of Palermo. He contends first that no judgment awarding any restitution or decreeing any recovery of money from him ought to have been entered, for he says that he had already returned all that he had received, saying that by the writ of possession in the unlawful detainer action he had taken over only the real property which included the theater building and this he says he had

returned. In this contention the evidence does not bear him out. Palermo himself testified that when he entered the Star Theatre for the take-over the theater had been showing pictures that day; that he went there with the constable at 11 o'clock at night after everybody had gone and that on the following day he closed the theater down; that he kept it closed for two weeks and then began showing pictures again. It is true that the trial court found that, when Palermo took over, the theatre company had ceased to do business on the premises. In view of the uncontradicted testimony of Palermo himself that finding is without support. Palermo argues further that he did not take possession, under the judgments, of the personal property with which the theater was conducted, but here he turns a very sharp corner. He caused execution to be issued upon the money award decreed in the unlawful detainer judgment, caused it to be levied upon all of the said personal property and, when it had been sold for a nominal price of $250 to one Rowan, he rented the same from Rowan at $25 a month and continued to use it in conducting the business. This equipment had not been removed from the theater building. These facts and circumstances, coupled with the acts of Palermo in restoring this property, along with the real property, after the remittiturs had been received, fully supported the trial court in its treatment of the property, both real and personal, as a unit so far as the accounting was concerned.

Palermo contends further that no accounting ought to have been taken and that the recovery should have been limited to the use value of the property, less the agreed rental therefor. There might be circumstances under which such a measure of recovery would not only be necessary but would also be just; but it does not lie in the mouth of Palermo to say that the theatre company either could have been or should have been limited to such recovery. It was renting the property from Palermo as a moving picture theater and the building was designed and equipped for that purpose. Palermo, therefore, took over something more than bare walls and empty seats. The fundamental purpose of the court in responding to the demand for restitution was to do equal and exact justice insofar as that could be done to the corporation which, by judicial error, had been deprived of its property, its business and its business opportunity. We cannot say on this record that the means adopted, that is, an accounting of the profits of the business, as well as a restitution

of the physical property involved, was not fully warranted. On the contrary, it would appear from the record herein that no less a measure of recovery would have been responsive to the just demands of the theatre company. The position of Palermo is well described by Justice Cardozo in *Golde Clothes Shop* v. *Loew's Buffalo Theatres*, 236 N.Y. 465 [141 N.E. 917, 30 A.L.R. 931, 935], as follows: "The defendant knew, when it made the improvements, that its right to the possession was contested by the tenant. It knew that an appeal was pending. It took the risk, and went ahead." Here Palermo was guilty of no wrongdoing in seeking to acquire the fruits of the judgments he had obtained, yet he knew those judgments were not final and that the basic one had already been made the subject of an appeal. He knew that if that appeal was unsuccessful it would only be because the uncertain question of whether or not his tenant's lease had been made void by the abrogation of the treaty referred to, should finally be resolved in his favor; and he knew that if the appeal was successful he would be subject to a demand by the theatre company that he account for all that he had received through his enforcement of the questioned judgments. We see nothing unjust in the court's holding him to such an accounting.

Palermo contends further that the theatre company in the period between the declaratory relief judgment and the take-over under the writ of restitution had allowed the theater premises to become in a state of disrepair in violation of a covenant of the lease which required the lessee to keep and maintain the premises and all parts thereof in a clean and orderly manner and condition; that by reason of this breach of the lease the theatre company had no right of restitution. The theatre company could not, he says, compel a performance of the lease which it had breached. This contention, however, misconceives the scope and purpose of the restitution action. To make out the right of restitution it was only necessary for the theatre company to show, what of course could not have been denied, that things of value had been taken from it through the judgments appealed from and through Palermo's enforcement thereof and had passed into Palermo's hands and that thereafter the judgments had been reversed. Immediately the right of restitution arose and it was the duty of the court to place the parties back as nearly as could be in the situation in which each had been

when the erroneous judgments were rendered. Says the Restatement, *supra*, comment b:

"The rule [of restitution] is applicable whether the judgment subsequently reversed was originally valid or was void. Where money has been paid thereunder or property has been transferred, a court issuing such judgment nevertheless has power to remedy the consequences of its error and to order restitution . . .

". . . Upon a reversal of the judgment anything paid by way of settlement can be recovered from any person not a bona fide purchaser, although the payment was made without duress, although no execution was issued, and although the payor could have obtained a supersedeas or stay of execution . . .

"The fact that the judgment was merely set aside and that no final judgment was entered for the payor does not prevent restitution; if the appellate court vacates the judgment and orders a new trial, a person who has satisfied the judgment vacated is entitled to restitution."

Palermo did not in the original action for declaratory relief seek to have the invalidity of the lease declared upon any ground other than the effect he contended the treaty abrogation had had upon it, and it was by reason of the judgment he secured in the litigation of these issues he had tendered that the property and rights of his tenant passed into his possession. In the restitution action, therefore, he cannot avoid restitution by pleading matter outside the issues of the original suit. Upon this point we quote the following from 5 Corpus Juris Secundum, section 1984:

"Matters which might have been pleaded in the original action cannot be set up as a defense in an action or proceeding for restitution; neither is it a defense that the judgment creditor received the money in good faith, or that the next trial or hearing will result in the same·judgment or decree as the first. . . .

"No claim outside of the original suit, and not disposed of by the judgment, can be set up."

This contention of Palermo's cannot, therefore, be sustained even though the trial court did permit him to introduce evidence as to whether or not the asserted obligation of the lease had been breached and obtain a finding that it had been. The trial court rightly ignored the finding by concluding that, notwithstanding the same, restitution would be enforced.

Palermo further contends that the theatre company cannot attack the accounting for the reason that, as he puts it, ''Restitution and damages are entirely discretionary and this is a complete answer to appellant's argument that the trial court erroneously allowed numerous credits to Palermo.'' To some extent it may be said that whether or not the remedy of restitution will be granted may rest in the sound discretion of the court. Thus an appellate court may refuse to grant it as a part of the proceedings on appeal, where to do so would involve the taking of an account and the trial of many issues of fact which would be raised during the course of such accounting. And circumstances may justify the accordance of other remedies than restitution when application for restitution is made in the trial court. But we have already held that restitution through accounting of the profits of the theater business conducted in the premises by Palermo was here justified, and that being so the taking of the account itself must be done, not as a mere matter of grace, but according to the rules governing such accountings as laid down in the authorities, some of which we have hereinbefore referred to. (See, for example, *Ward* v. *Sherman, supra.*) In such an accounting the court could not give or withhold allowances arbitrarily, but must give or withhold in accordance with recognized rules of accounting.

Turning now to the appeal of the theatre company, we find it first contending that the trial court erred in holding that Forrest E. Macomber, one of the attorneys of record for Palermo, was not liable jointly with Palermo for all sums of money received by him derived from the proceeds of the theater business which Palermo had conducted. It is claimed that this liability of Macomber ought to have been adjudged for the following reasons: Before Palermo began the action wherein he sought to have the lease declared void, Macomber had acted as the attorney for the theatre company in an action which that company had brought, seeking to enforce against Palermo's predecessor in interest an option for a renewed 10-year term given it in a preceding lease and which option it alleged it had exercised; while so acting as attorney for the theatre company Macomber had obtained confidential information which he used when thereafter he ''changed sides,'' as appellant puts it, and became one of the attorneys representing Palermo in the declaratory and unlawful detainer actions. The applicable rule is stated in *Wutchumna*

*Water Co.* v. *Bailey,* 216 Cal. 564, 571 [15 P.2d 505], as follows:

". . . The relation of attorney and client is one of highest confidence and as to professional information gained while this relation exists, the attorney's lips are forever sealed, and this is true notwithstanding his subsequent discharge by his client and notwithstanding the lack of any justification for such action.

" 'The obligation to represent the client with undivided fidelity does not end with the matter in which the lawyer may have been employed. Thenceforth the lawyer must refrain not only from divulging the client's secrets or confidences, but also from acting for others in any matters where such secrets or confidences or knowledge of the client's affairs acquired in the course of the earlier employment can be used to the former client's disadvantage.' "

Rule 5 of the Rules of Professional Conduct for the California State Bar provides:

"A member of the State Bar shall not accept employment adverse to a client or former client, without the consent of the client or former client, relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client."

The theatre company further invokes the rule stated in Restatement of the Law of Restitution, section 197, as follows:

"Where a fiduciary in violation of his duty to the beneficiary receives or retains a bonus or commission or other profit, he holds what he receives upon a constructive trust for the beneficiary."

Palermo does not deny that the foregoing authorities properly state the rules governing activities of an attorney who, having represented a client, thereafter represents an adversary, but says that under the facts the rules have no application. Upon these issues the trial court found in effect that Macomber was free from blame in the matter and was not liable to the theatre company. We think the finding is sustained by the evidence. As stated in *Wutchumna Water Co.* v. *Bailey, supra,* page 572, approving a statement by Circuit Judge Morrow in *In re Boone,* 83 F. 944, 952:

". . . 'The test of inconsistency is not whether the attorney has ever appeared for the party against whom he now pro-

poses to appear, but it is whether his accepting the new retainer will require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him, and also whether he will be called upon, in his new relation, to use against his former client any knowledge or information acquired through their former connection.' ''

As we have said before, the unlawful detainer action depended entirely for its justification upon the adjudication obtained in the declaratory action that the lease was void; and the declaratory action presented no issue of fact save only this: Was the theatre company a corporation whose stockholders were Japanese nationals? As to this issue of fact there was never any dispute and the declaratory action presented only issues of law for adjudication. The record of the declaratory action was introduced in evidence and therefrom it appears that Macomber was not an attorney of record, at least until after there had been filed therein by other attorneys representing the theatre company a stipulation that the stockholders of that company were subjects of Japan. Specifically upon the issue of whether or not he had ever obtained any confidential information concerning this sole issue of fact presented by the pleadings in the declaratory action Macomber testified that the nationality of the stockholders of the theatre company was a matter of common knowledge and not the subject of any information either gained or used by him or imparted by him to Palermo. Furthermore, if the theatre company believed that Macomber's accepting adverse employment was detrimental to it or involved a violation of professional ethics by Macomber it could have raised the objection at any time and upon a proper showing the trial court would have granted it preventive relief. *Wutchumna Water Co.* v. *Bailey, supra,* was a case wherein the former client, who felt its former attorney was acting unprofessionally in taking adverse employment, sought and obtained an injunction preventing such activity. Apparently it was not until it filed this action for a money recovery that the theatre company advanced any claim before any court that Macomber's actions were harmful. We are not here called upon to rule upon or to comment on the actions of Macomber from the point of view of ethics. What appellant seeks here is a money recovery based upon a charge of unprofessional conduct and we think it clear from what

we have said that the trial court's adverse findings find ample support in the record.

Palermo was in possession of the theatre for approximately 32 months and the gross receipts for that period amounted to ............... $327,712.85

There was charged against this a series of items constituting generally such matters as federal admissions tax, Stockton amusement tax, salaries and wages, payroll taxes, film rental, legal cost, repairs, advertising, supplies and the like, yielding a total of ................ 223,480.87

Leaving a balance at that point of ............. $104,231.98

The court allowed Palermo a management fee in the sum of 50% of this net amount, leaving a balance of ........................... 52,115.99

Palermo had paid personal income taxes to the state and federal governments upon his gross personal income, which, as per his filed returns, included all net receipts from the theatre. The court ascertained that of the total payments so made by him there was attributable to receipts from the theatre, and which the court charged against the theatre company, the sum of ...................... 29,333.44

This left a net theatre profit for the whole period of ...................................... 22,785.55

From this the court deducted rental at the agreed rate, and not paid by the theatre company, the sum of ............................. 9,123.80

Leaving as the amount which the theatre company was adjudged to recover from Palermo the final figure of .......................... $ 13,658.75

Appellant attacks this accounting by pointing to specific instances of allowances which it challenges. It challenges in part the allowance for salaries and wages, claiming that Palermo was allowed credit for payment to employees made after he had turned back the theater and the business to the theatre company. These allowances aggregate $294.27. We think it cannot be said that no allowance could be made after the day of the turn back since it did not necessarily follow that some payments beyond that date might not properly be made. We cannot say from this record that the court allowance of these items is not justified.

The theatre company also challenges in part the allowance for repairs, maintenance and services, claiming that some of these items were improperly allowed since they were in the nature of capital investments or items of purely personal expense. Space will not permit us to treat of these challenges in detail and it must suffice to say that an examination of them does not demonstrate that they were not properly allowable. Much must, of course, be left to the discernment and judgment of the trial court in such matters. The same must be said as to certain challenges concerning allowances for auto repairs, insurance and depreciation on cars, the challenge being that to some extent these were matters personal to Palermo and not related to the theater business; and we must say the same as to the challenges to the allowances for supplies, theater insurance and sundry expenses.

We now come to specific challenges of credits allowed Palermo where the challenge is that the items were for matters that had no relation to the business being accounted for. The first of these was a credit of two items in the sum of $3,000. This sum Palermo paid out in the compromise of an escheat action brought by the State of California. It appears that after Palermo began the declaratory action alleging that the lease was invalid because of the abrogation of the international treaty and after he had obtained a judgment so decreeing the State of California brought an action to escheat the real property involved, and, of course, the leasehold estate of the theatre company. Palermo appeared in the action through Mr. Macomber, his attorney, and the state's claim of escheat was settled for the sum of $2,000. Mr. Macomber for his services received $1,000. The complaint in the action was not served upon the theatre company and it made no appearance in the cause. It is not claimed by Palermo that the theatre company was consulted by him or his attorney or considered in any way and it is clear from the record that the sum paid the state in compromise of the escheat action and the sum paid the attorney for representing Palermo in that action were voluntarily paid by Palermo for his own use and benefit. We hold that neither of these sums can properly be charged to the theatre company. It may be that some indirect benefit resulted to the theatre company, but Palermo was in an adversary position to it throughout and can justly claim no credit against it because, in protecting his property interest, he, without even consulting the theatre company,

much less being authorized by it, conferred some incidental benefit upon it.

■ The theatre company attacks an allowance made by the court to Palermo concerning capital improvements, including an air conditioning system, the total cost being in excess of $10,000. The amount of this total which was charged against the theatre company was arrived at by applying the income tax depreciation rates used by Palermo. To so allocate the cost of capital improvements appears to have been as an equitable an approach to the problem as could be arrived at and the allowance must be upheld. ■ The theatre company likewise challenges the allowance by the trial court to Palermo of a sum representing monthly rental under the lease for the period of Palermo's occupation of the theater. Says the appellant: "It is most inequitable to allow Palermo a credit for his unpaid rent during the period between the rendition and the final reversal of the erroneous judgment in his favor, in which he, rather than appellant-lessee, enjoyed the possession, income from and use of the leased theatre premises." We think the challenge is not sound. It was the duty of the trial court, in calling Palermo to account, to deal with both parties as justly as the circumstances would permit. In doing this the trial court was vested with a broad discretion and we think in allowing the rentals it acted within the proper bounds of such discretion. It must be borne in mind, as it undoubtedly was borne in mind by the trial court, that Palermo was not a wrongdoer in enforcing his judgments even though it finally turned out on appeal that those judgments had been erroneously rendered. Under such circumstances, when the trial court allowed a recovery by the theatre company from Palermo of the profits of the business it was just and fair that the ordinary and usual expense of operating such business, which includes rentals of leased premises, should be charged against the gross income.

■ The court allowed to Palermo a management fee of 50 per cent of the net profits derived during the period of his operation of the theater business. This allowance is challenged as being excessive. As we have seen, this fee for the period of some 32 months of management amounted to $52,115.99. At first blush it is difficult to believe that so large a fee was justified. On full consideration, however, we have concluded that the trial court's decision on this matter ought to be accepted on appeal. The situation presented was an unusual one and the evidence shows no set

standards nor even approximate standards whereby the trial court could be guided. Undoubtedly the trial court relied somewhat upon testimony of one of the officers of the theatre company who stated that under war conditions and while the stockholders were interned such a management fee had been contracted for by the theatre company. This testimony, however, seems to be of little weight since it is so glaringly apparent that the bargain which the officers of this corporation could drive from the disadvantage of internment might well be far different from the bargain they could make under normal circumstances. In its attack upon this item the theatre company points to no expert testimony anywhere appearing by those in the theater business as to what would be a fair management charge. The trial court had itself taken the long and complicated account of that business and undoubtedly better realized the importance and the probable worth of management services than could anyone not so situated. A fair allowance was required and we think that the allowance made by the trial court is substantially supported and that the fixing of a proper allowance presented factual issues which, being so supported, must prevail on appeal.

The trial court allowed a credit to Palermo for his personal income taxes paid by him which the trial court found to be attributable to receipts from the theater business. The sum allowed was in excess of $29,000, as hereinbefore stated. This allowance, however, was not final. The trial court found that there might accrue or become available to Palermo, and that he might receive, income tax refunds of all or a portion of the income taxes attributable to the theater business and paid by him and allowed to him as a credit in his account; that these benefits might come to him by means of his filing amended personal income tax returns and claims for refund or by means of negotiations, settlements and agreements with federal and state tax agencies. The court also found it was unable at the time to determine the amount of such tax benefits which might accrue or be received by Palermo in the premises and that the theatre company was entitled to receive from Palermo any and all tax refunds if and when Palermo should receive the same. The court concluded that Palermo ought to be, and he was therefore declared to be, a trustee of such tax claims above referred to and of the moneys which he might thereafter receive on account thereof and the court declared that it was reserving, and did reserve, continuing jurisdiction of the cause for making such orders and decrees

as might thereafter become meet and proper for the enforcement and the administration of said trust. The judgment decreed that Palermo was a trustee from the date of the judgment in respect to the tax claims referred to in the findings and conclusions and of the money which might be received by him therefrom, and that such money should be for the use and benefit of the theatre company. The court, by the decree, retained continuing jurisdiction as stated in the conclusions of law.

██ Recalling that, while Palermo was not a wrongdoer in taking over the theater business, yet he was chargeable with knowledge that he did so by force of judgments not final and must therefore make restitution if reversal resulted from the pending appeals, we are unable to see how Palermo was justified in paying personal income taxes based upon his receipts from the theater business without taking available precautions to protect himself and the theatre company in the event he should be called upon to make restitution of those receipts. We think that Palermo's personal income tax situation had nothing to do with his accounting of the theater business in this action for restitution, nor do we think that the trial court's action in declaring Palermo to be a trustee of any claims he might have for tax refunds, with liability to pay over to the theatre company whatever he might receive by such claims, is a device in anywise fitted to achieve equity between the parties. The theatre company will, of course, have to pay its income taxes in respect to the benefit it derives from the theater business and we cannot see that Palermo's voluntary action in the payment of his personal income taxes could in anywise be for the benefit of the theatre company so that it ought to be charged with the amounts he thus expended. This charge against the theatre company cannot be upheld.

Finally, the theatre company contends that for whatever moneys the account showed Palermo ought to turn over to it interest should be charged against him from the date the remittiturs were filed following reversal of the judgments under which he was acting. ██ From that date, as has been seen from the authorities heretofore cited, Palermo was chargeable as a trustee for all property and benefits in his hands which came there through the enforcement of the judgments and which he ought, therefore, to restore. But certainly when the trial court determined, as we have said it did properly determine, that restitution should include not

only the delivery of possession of the real and personal property passing into the possession and use of Palermo through the erroneous judgments, but also the profits accruing from Palermo's operation of the business, it became necessary not only that a detailed accounting of that business be taken, but also that a great multitude of determinations be made in order to ascertain the true profit which ought to be paid over to the theatre company. What has already been said illustrates the truth of this statement. ██ The fundamental rule guiding the court in this proceeding was, so far as possible, to place the parties in as favorable a position as they could have been in had the judgments not been enforced pending appeal. Whether, therefore, it would be just and equitable that interest be charged from the date the remittiturs were returned upon such sum as after a long and complicated accounting might have been found then to have been due presented a question calling for judicial discretion in determining what equity required. This, therefore, we think presented an issue peculiarly for the trial court to determine insofar as the allowance of interest upon the amount ultimately found due be concerned, and we cannot say on this record that the trial court abused that discretion or in the refusal to allow interest prior to judgment failed to do equity. ██ Generally speaking, where an accounting is required in order to arrive at a sum justly due, interest is not allowed. (*Williams* v. *Flinn & Treacy*, 61 Cal.App. 352, 357 [214 P. 1024] ; *Davis* v. *Schneider*, 91 Cal.App. 631, 636 [267 P. 352] ; *Merchants Collection Agency* v. *Gopcevic*, 23 Cal.App. 216, 221 [137 P. 609].)

The judgment appealed from is modified and the cause is remanded to the trial court with directions to surcharge the account of Palermo by adding to the sums for which judgment is to be rendered against him the sum of $3,000, expended by him in the escheat proceedings, and the further sum of $29,333.44 paid by him on income taxes; and as so modified the judgment is affirmed; the appellant theatre company to recover costs on appeal.

Peek, J., concurred.

A petition for a rehearing was denied December 16, 1953, and plaintiff and appellant's and defendant and appellant's petitions for a hearing by the Supreme Court were denied January 27, 1954. Edmonds, J., Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.