2015 COA 104

**ZEKE COFFEE, INC., a Colorado corporation, and Darren Spreeuw, Plaintiffs–Appellees and Cross–Appellants,**

v.

**PAPPAS–ALSTAD PARTNERSHIP, Defendant–Appellant and Cross–Appellee.**

**Court of Appeals No. 14CA0255**

Colorado Court of Appeals,
Div. III.

Announced July 30, 2015
Rehearing Denied September 24, 2015

---

\* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2014.

City and County of Denver District Court No. 09CV11786, Honorable Edward D. Bronfin, Judge.

Daniel J. Culhane, LLC, Daniel J. Culhane, Denver, Colorado, for Plaintiffs–Appellees and Cross–Appellants.

EasonRohde, LLC, David R. Eason, Bruce E. Rohde, Denver, Colorado, for Defendant–Appellant and Cross–Appellee.

Opinion by JUDGE DAILEY

¶ 1 In this landlord-tenant dispute, defendant, Pappas–Alstad Partnership, appeals the district court's restitutionary award of $167,024 plus statutory interest to plaintiffs, Zeke Coffee, Inc., d/b/a Perk Hill Cafe, and Darren Spreeuw, president of Zeke Coffee (collectively, Zeke). We affirm and remand for an award of attorney fees.

## I. Background

¶ 2 The underlying facts of the case are fully set forth in *Zeke Coffee, Inc. v. Pappas–Alstad Partnership,* (Colo.App. Nos. 11CA0744 & 11CA2317, 2012 WL 1473340, Apr. 26, 2012) (not published pursuant to C.A.R. 35(f)) (*Zeke I*).

¶ 3 As pertinent here, in March 2004, Zeke leased, for five years, a retail space from Pappas–Alstad to use as a coffee shop. In September 2008, Zeke notified Pappas–Alstad of its intent to exercise an option to extend the lease for an additional five-year term. Pappas–Alstad, however, said Zeke had breached a term of the lease and, after Zeke refused to cure the alleged breach, it notified Zeke that the lease had been terminated and converted into a month-to-month tenancy. In June 2009, Pappas–Alstad served a three-day demand for compliance or possession on Zeke, again alleging that Zeke had breached the lease. Zeke acted to cure the alleged breaches.

¶ 4 Several months later, Zeke filed an action in the district court seeking a declaratory judgment that the lease remained in effect and that Pappas–Alstad had breached it. In response, Pappas–Alstad served Zeke with a notice to quit under the forcible entry and detainer statute, section 13–40–107, C.R.S.2014, and included in its amended answer a counterclaim seeking Zeke's eviction.

¶ 5 The district court entered judgment in favor of Pappas–Alstad on the counterclaim and issued a writ of eviction restoring possession of the property to Pappas–Alstad. After Pappas–Alstad successfully opposed Zeke's requests for a stay of execution of judgment, Pappas–Alstad evicted Zeke from the premises.

¶ 6 On appeal, a division of this court reversed and remanded the case with directions. *See Zeke I*. The division held, among other things, that

- the district court erroneously determined that Zeke's alleged breaches of the lease supported Pappas–Alstad's rejection of Zeke's exercise of the five-year option on the lease;

- Zeke had properly exercised the option, meaning that the lease had not been converted to a month-to-month tenancy and was "in full force and effect on the date of judgment"; and

- Zeke was "entitled to an appropriate remedy for this situation."

*Id.* at 14, 21–22. The division remanded the case so the district court could determine an "appropriate remedy." *Id.* at 22.

¶ 7 On remand, the parties disagreed as to the appropriate remedy. Zeke argued that, because it had been wrongfully evicted, it should be awarded actual, consequential, and special damages for the loss of its business, as well as possible punitive damages; Pappas–Alstad argued that because, in evicting Zeke, it was relying on a validly entered but ultimately erroneous court order at the time of the eviction, Zeke should receive only restitution equal to any benefit realized by Pappas–Alstad.

¶ 8 In a written order, the district court determined that, because Zeke had lost its right to possession of the retail space as a result of an erroneous court order, restitution was the appropriate remedy. After an evidentiary hearing at which both parties presented expert testimony on the amount of restitution owed, the court awarded Zeke $167,024 (plus 8% statutory interest from the date of eviction), representing the value of (1) the rent Pappas–Alstad had received from its new tenant in the retail space; (2) the rent it would receive through the remainder of Zeke's lease term (i.e., through April 30, 2019), discounted at the rate yielded by United States Treasury Bills; and (3) the rent Pappas–Alstad would have received had the new tenant moved in and begun making payments immediately following the eviction.[1]

¶ 9 Pappas–Alstad appeals and Zeke conditionally cross-appeals. In its appeal, Pappas–Alstad contends that the court erroneously calculated the amount of restitution Zeke was due by (1) basing it on actual and potential rental income from the premises and (2) using the Treasury Bill rate to discount the amount of future rent proceeds to present value. In its cross-appeal, Zeke contends that if we conclude that the court erred in determining the amount awarded, then, but only then, should we remand the case with directions to the district court to apply damages for a "wrongful eviction" as the appropriate remedy, not restitution.

## II. Pappas–Alstad's Appeal: Calculating Restitution

### A. Actual and Potential Rental Income as Bases for the Award

¶ 10 Pappas–Alstad first contends that the district court erred in using its actual and potential rental income from the premises as a measure of the appropriate restitution because this measure (1) did not "account for the full effect of the erroneous judgment" and the gain *actually realized* by Pappas–Alstad; (2) left Pappas–Alstad "worse off" than if the erroneous judgment had never occurred; (3) provided a corresponding windfall to Zeke; and (4) violates public policy. We are not persuaded.

¶ 11 Whether the district court has applied the correct legal standard in determining the *availability* of a particular equitable remedy is reviewed de novo. *See Redd Iron, Inc. v. Int'l Sales & Servs. Corp.*, 200 P.3d 1133, 1136 (Colo.App.2008). But the power to determine the *components* of such a remedy is within the court's discretion. *Beren v. Beren*, 2015 CO 29, ¶ 12, 349 P.3d 233.

¶ 12 Because Pappas–Alstad challenges the *amount* of restitution awarded rather than the propriety of restitution as the appropriate remedy, we review the district court's award for an abuse of discretion. *Id.* A court abuses its discretion only if its decision is manifestly arbitrary, unreasonable, or unfair, or is based on an erroneous view of the law. *DeJean v. Grosz*, 2015 COA 74, ¶ 14.

¶ 13 Restitution is an equitable remedy which provides "a measure of damages which restores a party to his/her prior status. It is available as a remedy when the injured party is due reimbursement for a benefit conferred upon another." *Montoya v. Grease Monkey Holding Corp.*, 883 P.2d 486, 489 (Colo.App.1994), *aff'd*, 904 P.2d 468 (Colo.1995). It is used to " 'deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.' " *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1063 (Del.1988) (quoting *Mass Transit Admin. v. Granite Constr. Co.*, 57 Md.App. 766, 471 A.2d 1121, 1125 (1984)).

¶ 14 " 'A person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable.' " *Beren,*

¶ 47 (quoting Restatement (First) of Restitution § 74 (1937)).

¶ 15 Where the judgment has been reversed or set aside on appeal, "comment m to [section 74 of the Restatement (First) of Restitution] provides that if the judgment creditor acted in good faith, the sale was properly conducted, and the property was acquired by a bona fide purchaser, the judgment debtor is entitled to recover only *the proceeds from the sale*, plus interest." *Tuscany, LLC v. W. States Excavating Pipe & Boring, LLC*, 128 P.3d 274, 281 (Colo.App. 2005) (emphasis added).

¶ 16 Relying on the rationale of *Tuscany*, the district court in this case determined that "an equivalent approach—the proceeds from the [new tenant's] lease, plus interest—should apply here." It concluded that "the conditions for the application of *Tuscany* and comment m of the Restatement apply" because Pappas–Alstad had acted in good faith reliance on a presumably valid judgment for possession when it evicted Zeke and released the premises to a bona fide lessee within six weeks of the eviction.

¶ 17 The court concluded that "[Pappas–Alstad]'s gain is what it has received from the lease proceeds from the new tenant ... up to the present, and what it will receive from leasing the Premises through the remainder of the term of [Zeke]'s lease," i.e., until May 2019, plus interest.

¶ 18 We perceive no error in this ruling.

¶ 19 If a judgment ordering an eviction is reversed on appeal, " 'a party is in general entitled to restitution of all the things lost by reason of the judgment in the lower court; and, accordingly, the courts will, where justice requires it, place him as nearly as may be in the condition in which he stood previously.' " *Stockton Theatres, Inc. v. Palermo*, 121 Cal.App.2d 616, 264 P.2d 74, 78 (1953) (quoting *Ward v. Sherman*, 155 Cal. 287, 100 P. 864, 865 (1909)) (cited with approval in *PSM Holding Corp. v. Nat'l Farm Fin. Corp.*, 743 F.Supp.2d 1136, 1141–43 (C.D.Cal.2010)).

¶ 20 But where, as here, a tenant has been erroneously evicted from a premises that has since been re-leased to a third party or sold, the court cannot equitably restore the exact thing lost by execution of the erroneous judgment, i.e., possession of the premises. *See Munoz v. MacMillan*, 195 Cal. App.4th 648, 124 Cal.Rptr.3d 664, 671–72 (2011). Thus, "for all practical purposes, the only appropriate remedy for vacating tenants who prevail on appeal, but who failed to obtain a stay, may be a monetary award sufficient to compensate [the tenant] for the property rights not restored." *Id.* at 672 (emphasis and internal quotation marks omitted).

¶ 21 "[T]he measure of the loss sustained by the judgment debtor under the erroneous decree for which restitution was allowed was exactly that which was gained by the judgment creditor either in money, property, or the rents, issues, or profits derived therefrom...." *Mann v. Thompson*, 118 So.2d 112, 115 (Fla.Dist.Ct.App.1960) (cited with approval in *Tuscany*, 128 P.3d at 281); *see Stockton Theatres*, 264 P.2d at 78–79 (tenant entitled to all profits realized by landlord during landlord's period of possession under erroneous order); *cf. Tuscany*, 128 P.3d at 281 (the rightful possessor is entitled to recover all proceeds gained from the sale of the disputed property under an erroneous order).[2]

¶ 22 Pappas–Alstad argues, however, that the court's award to Zeke of actual and potential rental income was unjust because it did not "account for the full [financial] effect of the erroneous judgment" on both of the parties. In its view, the court should not have awarded Zeke rental payments that Zeke would have made anyway to Pappas–

---

2. Courts determine what was gained by the landlord during the period of its possession through the duration of the tenant's lease:

A leases Blackacre to B for five years. After four years, under a claim that B has not performed the covenants in the lease, A obtains a judgment awarding him possession of Blackacre and takes possession. A year later the judgment is reversed. B is entitled to *restitution for the period of A's occupancy up to the expiration of the lease period,* but is not entitled to regain possession of Blackacre.

Restatement (First) of Restitution § 74 cmt. c, illus. 8 (1937) (emphasis added).

Alstad had the eviction never occurred and should have reduced any restitution award by the expenses Pappas–Alstad incurred in re-leasing the premises and the rent it did not collect,[3] amounts which, in the end, would cause it to incur a loss, or, "at best, a 'wash'" during the time from Zeke's eviction to the latest possible end date for Zeke's lease. We are not persuaded.

¶ 23 Initially, we reject Pappas–Alstad's assertion that restitution should not include an amount representing rental payments the tenant would have made had it not been improperly evicted. In *Stockton Theatres*, the California Court of Appeals determined that a tenant, who had been erroneously evicted from its leased movie theatre, was entitled to restitution in the form of the landlord's profits from the theatre during the landlord's period of possession. 264 P.2d at 79. The court reasoned that only the landlord's full profits, rather than a reduced measure arrived at by subtracting the tenant's rental rate, would adequately restore what the tenant lost:

> There might be circumstances under which such a measure of [reduced] recovery would not only be necessary but would also be just; but it does not lie in the mouth of [the landlord] to say that the [tenant] either could have been or should have been limited to such recovery. It was renting the property from [the landlord] as a moving picture theater and the building was designed and equipped for that purpose. [The landlord], therefore, took over something more than bare walls and empty seats. The fundamental purpose of the court in responding to the demand for restitution was to do equal and exact justice in so far as that could be done to the corporation which, by judicial error, *had been deprived of its property, its business and its business opportunity*. We cannot say on this record that the means adopted, that is, an accounting of the profits of the business ... was not fully warranted. On the contrary, it would appear from the record herein that no less a measure of

recovery would have been responsive to the just demands of the [tenant].

*Id.* at 78–79 (emphasis added); *see also Erickson v. Boothe,* 127 Cal.App.2d 644, 274 P.2d 460, 463 (1954) (rejecting "[a]n identical contention" regarding reduction of restitution by the agreed rental rate for a cattle ranch because "the fundamental purpose of the court in responding to the demand for restitution was to do equal and exact justice insofar as that could be done to [the rightful possessor] who, by judicial error, had been deprived of his property, his business and his business opportunity") (cited with approval in *PSM Holding Corp.,* 743 F.Supp.2d at 1143).

¶ 24 Similarly, in this case, Zeke was operating its coffee shop on the premises and lost its ability to run that business there as a result of the erroneous judgment permitting his eviction. Although Zeke would have had to pay rent to Pappas–Alstad had the erroneous judgment never been entered, it also would have been able to maintain its coffee business and the business income opportunities associated with it. Thus, like the courts in *Boothe* and *Stockton Theatres,* we cannot say that the district court abused its discretion in not reducing Pappas–Alstad's rental income by the rent it would have otherwise received from Zeke. *See Boothe,* 274 P.2d at 463; *Stockton Theatres,* 264 P.2d at 78–79.

¶ 25 Nor was the court, acting in its discretion, required to reduce from the award Pappas–Alstad's expenses or losses in re-leasing the property.

¶ 26 "As a general rule, the party to whom property has been awarded under an erroneous judgment may, upon reversal, deduct expenses that he necessarily incurred in the protection of that property and the payment of taxes and liens." *Aye v. Fix,* 192 Mont. 141, 626 P.2d 1259, 1262 (1981) (citing Restatement (First) of Restitution § 74, cmt. e (1937)) (rental payments to state government could be reduced from restitution owed).

¶ 27 But a landlord who relies on a judgment with respect to matters other than

---

**3.** This encompasses rent not collected during (1) the six weeks the premises were vacant, following Zeke's eviction; and (2) the three-month rent abatement Pappas–Alstad gave the new tenant of the premises at the beginning of its lease term.

protecting the property or paying taxes or liens—including making the best use of the premises—assumes the risk and expense associated with those actions when its right to possession has been appealed. Judge—later United States Supreme Court Justice—Benjamin Cardozo recognized this, writing on behalf of the New York Court of Appeals in *Golde Clothes Shop v. Loew's Buffalo Theatres*, 236 N.Y. 465, 141 N,E. 917 (1923) (cited with approval in *PSM Holding Corp.*, 743 F.Supp.2d at 1143). In that case, the court refused to reduce restitution for an erroneously evicted tenant by the amount of money expended by the landlord in making extensive improvements to the leased premises because "[t]he defendant knew, when it made the improvements, that its right to the possession was contested by the tenant. It knew that an appeal was pending. It took the risk, and went ahead." *Id.* at 919; *see also Boothe*, 274 P.2d at 463 (declining to discount the amount of restitution to which the rightful possessor was entitled by the cattle profits made by the party in possession under an erroneous order beyond those that would have been made by the rightful possessor, reasoning that "[a]lthough [the party in erroneous possession] was guilty of no wrongdoing when she retook the property, she knew that judgment was not final; she knew that if the appeal were successful she would be subject to an accounting and full restitution").

¶ 28 Pappas–Alstad does not argue that the re-leasing expenses were necessary to protect the land, unlike the rental payments to the state in *Fix*. Instead, the expenses are closer to the renovation expenses and higher profits in *Golde Clothes Shop* and *Boothe*, respectively—the expenses were incurred to make the best and highest use of the property while Pappas–Alstad was in possession and to mitigate Pappas–Alstad's potential damages.

¶ 29 Further, as noted by Pappas–Alstad, it is a landlord's *obligation* to make reasonable efforts to re-lease a premises following eviction as a mitigation measure. *See Schneiker v. Gordon*, 732 P.2d 603, 611 (Colo. 1987). Because such an expense is directly tied to Pappas–Alstad's erroneous efforts to

evict Zeke and the corresponding duty to mitigate for its own benefit, it should not be deducted from Zeke's recovery.

¶ 30 Nor was the court required to reduce the award by rent Pappas–Alstad did not receive between the time of Zeke's eviction and the time the new tenant started paying rent. As the district court explained in declining to reduce the award by this unrealized rent, "a measurement of [Pappas–Alstad]'s gain may involve the reasonable rental value of the property during the full leasehold term during which [Pappas–Alstad] had or *could have received* rent, and that [Pappas–Alstad]'s (apparent) decision to leave the premises unrented and unoccupied may not represent the true measure of [its] gain." (emphasis in original).

¶ 31 Indeed, because Pappas–Alstad's possession under the erroneous order permitted it to obtain a replacement, rent-paying tenant as soon as Zeke had been evicted, we cannot say that the court abused its discretion in concluding that the proper measure of Pappas–Alstad's gain was the value of rental *potential* for the premises during that time.

### 1. Equity

¶ 32 Pappas–Alstad nonetheless argues that, contrary to principles of equity, the restitution award impermissibly left it "materially worse off" than if the erroneous judgment had never been entered, which, in turn, gave Zeke a "windfall." We disagree.

¶ 33 Initially, we note that Pappas–Alstad's argument is premised on the assertion that it qualifies as the kind of "innocent recipient" who should not be required to make restitution of its gains and who cannot be left "worse off ... than if the transaction with the claimant had never taken place." *See* Restatement (Third) of Restitution and Unjust Enrichment § 1, cmt. d (2011).

¶ 34 Pappas–Alstad qualifies as an "innocent recipient," it says, because it (1) sought and enforced the erroneous judgment of eviction in good faith and without wrongdoing *and* (2) bore no responsibility for its unjust enrichment. *See* Restatement (Third) of Restitution and Unjust Enrichment at § 50(1) (defining an "innocent recipient" as

"one who commits no misconduct in the transaction ... and who bears no responsibility for the unjust enrichment in question" (internal quotation marks omitted)).

¶ 35 Only the second circumstance cited above is at issue here. Pappas–Alstad asserts that it bore no responsibility for the unjust enrichment because Zeke's eviction was a result of the district court's actions rather than those of Pappas–Alstad. It was, Pappas–Alstad says, the district court—an institution of the state—that ordered Zeke's eviction and denied Zeke's request for a stay of execution on the judgment.

¶ 36 "In our adversary system, ... we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.... '[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties.'" *Greenlaw v. United States,* 554 U.S. 237, 243–44, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008) (quoting *United States v. Samuels,* 808 F.2d 1298, 1301 (8th Cir.1987) (R. Arnold, J., concurring in denial of reh'g en banc)). Consequently, a court ordinarily "will not sua sponte afford a party relief that it has not requested." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. Dep't of Health,* 64 F.Supp.3d 1235, 1257 n.7 (S.D.Ind.2014).

¶ 37 In the present case, the district court did not sua sponte order Zeke's eviction or deny its request for stay. The court made these decisions only at Pappas–Alstad's urging. Pappas–Alstad cannot now blame the district court for Zeke's losses or its gain. *See Casey v. Galli,* 94 U.S. 673, 680, 24 L.Ed. 168, 24 L.Ed. 307 (1876) ("Parties must take the consequences of the position they assume."); *Hansen v. State Farm Mut. Auto. Ins. Co.,* 957 P.2d 1380, 1385 (Colo.1998) ("[A] party may not later complain where he or she has been the instrument for injecting error in the case; instead, the party is expected to abide the consequences of his or her acts."); *Graves v. Bonness,* 97 Minn. 278, 107 N.W. 163, 165 (1906) ("In accordance with the general principle that parties must abide by the consequences of their own acts,

a party cannot, on appeal, complain of an error in the lower court which he was instrumental in causing or which he invited, *whether error was committed by himself alone or by the court at his instance.*" (emphasis added)); *see also, e.g., State v. A.R.,* 213 N.J. 542, 65 A.3d 818, 830 (2013) (The invited error doctrine applies to preclude relief when a defendant " 'in some way has led the court into error.' " (quoting *State v. Jenkins,* 178 N.J. 347, 840 A.2d 242, 249 (2004))); *State v. Chappell,* 97 Ohio App.3d 515, 646 N.E.2d 1191, 1204 (1994) ("A party who invites an error at trial has no one to blame but himself...."); *State v. Ferguson,* 201 Or.App. 261, 119 P.3d 794, 799 (2005) ("The point of the [invited error] doctrine is to ensure that parties do not 'blame the court' for their intentional or strategic trial choices that later prove unwise...."); *Mounger v. Mounger,* No. E2010–02168–COA–R3CV, 2012 WL 764913, at *3 (Tenn.Ct.App. Mar. 12, 2012) ("[W]e do not give relief on appeal to a party who is responsible for an alleged error that he or she blames on the trial court."); *Havill v. Woodstock Soapstone Co., Inc.,* 177 Vt. 297, 865 A.2d 335, 349 (2004) ("Plaintiff cannot blame the court for an error that is of her own creation....").

¶ 38 Restitution after an erroneous judgment is based "upon the theory that, in equity, the party who receives money or property in good faith under an erroneous judgment, thereafter reversed, *should be required to restore what he has received,* and not upon the theory of a supposed wrong committed." *Stockton Theatres,* 264 P.2d at 77 (internal quotation marks omitted). Thus, although Pappas–Alstad would not qualify as a *wrongdoer,* it must still restore everything it gained through an erroneous judgment. *See Topps Chewing Gum, Inc.,* 539 A.2d at 1063 ("Restitution may require not only the restoration of the property to its rightful owner but also compensation or reimbursement for the benefits enjoyed by the defendant through the use or possession of plaintiff's property *regardless of whether or not* the defendant is classified as a wrongdoer." (emphasis added)).

¶ 39 Pappas–Alstad provides no authority, other than the inapposite "innocent recipi-

ent" provision of the Restatement, to support its argument that an equitable remedy cannot inure to a party's detriment where that party obtained an erroneous judgment. Thus, we conclude that Pappas–Alstad's responsibility for Zeke's restitution, leaving it "worse off" than if no judgment of eviction had been entered, provides no basis to disturb the award.

¶ 40 Nor do we agree with Pappas–Alstad's assertion that the award rose to the level of a punitive judgment. Pappas–Alstad simply does "not explain how having to return something to which [it was] not legally entitled can be a 'penalty.'" *Strong v. Laubach*, 443 F.3d 1297, 1300 (10th Cir.2006).

¶ 41 Even so, the district court explicitly recognized that Pappas–Alstad relied on the erroneously entered eviction order in good faith, which is consistent with the above-cited law that those who have acted on erroneous judgments in their favor are not *wrongdoers* to be punished. This does not mean, however, that such reliance was well-advised or without risk, particularly after Pappas–Alstad learned that the order had been appealed. *See Golde Clothes Shop*, 141 N.E. at 919.

¶ 42 Finally, we reject Pappas–Alstad's assertion that Zeke necessarily received a windfall as a result of the district court's award. In the first instance, Pappas–Alstad's assertion is based on the testimony of its expert indicating that the value of the Zeke lease was only $8141; Zeke's expert, however, testified that such value was approximately $232,000. Although the court did not award Zeke all of its claimed losses, as noted above, Zeke lost the ability to run its coffee business on the premises when Pappas–Alstad received the judgment in its favor permitting Zeke's eviction. Consequently, Zeke is entitled to restitution in some form for its loss of possession, income, and business opportunity. *See, e.g., Stockton Theatres*, 264 P.2d at 78–79. Pappas–Alstad simply provides no reason why rental income from the premises is not an appropriate measure to compensate that loss or why, in light of that loss, it should be considered a "windfall."

## 2. Public Policy

¶ 43 Pappas–Alstad also argues that the court's measure of restitution here is "unworkable as a matter of policy." Specifically, it suggests that the award "runs directly counter to" (1) the principle favoring finality of judgment and (2) the requirement that landlords act expeditiously to re-lease premises following an eviction.

¶ 44 According to Pappas–Alstad, because the award did not adhere to these policy concerns, landlords can only obtain the benefit of an unstayed judgment granting an eviction if they act on it and it is affirmed on appeal. Otherwise, they will either be left worse off by a judgment of restitution, have a "fallow" premises and an eviction that they failed to mitigate, or be responsible for paying never-received, "phantom rent" to an erroneously evicted tenant.

¶ 45 Pappas–Alstad again overlooks that these kinds of risks are inherent in executing on any judgment that is not yet final on appeal. *See, e.g., Strong*, 443 F.3d at 1300 ("By executing on [its] judgment and receiving the [the property] during the pendency of the appeal, the [plaintiff] assumed the risk that [it] might have to repay the money if [defendants] prevailed on appeal."); *PSM Holding Corp.*, 743 F.Supp.2d at 1141 ("[Plaintiff] was not required to execute on the judgment pending appeal and took a risk in doing so.").

¶ 46 Pappas–Alstad's payment of restitution, in consequence of undertaking these risks by opposing the stay of an erroneously entered order of eviction, is not against public policy. *See Boothe*, 274 P.2d at 463 ("[I]n view of the record before us, we cannot say that the means adopted, that is, the accounting for the profits of the cattle business, was not warranted" where the party in possession acted knowing the judgment was not final.); *Stockton Theatres*, 264 P.2d at 79 ("[The landlord] knew that if the appeal was successful he would be subject to a demand by the theatre company that he account for all that he had received through his enforcement of the questioned judgments. We see nothing unjust in the court's holding him to such an accounting.").

¶ 47 For these reasons, we discern no error in the court's calculation of the measure of restitution.

## B. Discount Rate

¶ 48 We are also not persuaded by Pappas–Alstad's contention that the court erred in selecting the Treasury Bill rate as the discount rate to determine the present value of its future cash flow.

¶ 49 Pappas–Alstad recognizes that no Colorado case appears to have addressed the appropriate standard of review for a court's selection of the rate by which future cash flows should be discounted to present value. Other courts, however, have reviewed the issue for an abuse of discretion. *See, e.g., Scott v. United States*, 884 F.2d 1280, 1287 (9th Cir.1989); *Tiverton Power Assocs. Ltd. P'ship v. Shaw Grp., Inc.*, 376 F.Supp.2d 21, 28 (D.Mass.2005); *Gaskill v. Robbins*, 361 S.W.3d 337, 340 (Ky.Ct.App.2012); *Caruso v. Russell P. LeFrois Builders, Inc.*, 217 A.D.2d 256, 260, 635 N.Y.S.2d 367 (1995). We, too, adopt this standard.

¶ 50 The district court determined that the value of all future rent proceeds through the end of Zeke's lease, i.e., from 2014 to 2019, should be calculated using a discount rate. "[A] 'discount rate' is a way of estimating the time value of money, an important factor that is used in the process of determining the present value of a future cash flow." *Liriano v. Hobart Corp.*, 960 F.Supp. 43, 44–45 (S.D.N.Y.1997).

¶ 51 The district court then determined that the rate at which the future rent proceeds should be discounted was the Treasury Bill rate, which "is the rate at which the government borrows money by daily auctions of Treasury bills. It is risk-free because there is no risk that the government will not pay its debts." *Golden State Transit Corp. v. City of Los Angeles*, 773 F.Supp. 204, 216 n.18 (C.D.Cal.1991). The Treasury Bill rate is often used to discount, to present value, awards of future damages. *See, e.g., Liriano*, 960 F.Supp. at 45–46 (noting that the Treasury Bill rate is New York's "favored method" to reduce awards of future damages to present value); *Moeller v. Bertrang*, 801

F.Supp. 291, 296 (D.S.D.1992) (applying Treasury Bill rate to determine present value of future retirement benefits).

¶ 52. Pappas–Alstad argues that the rate suggested by its expert would have been more appropriate because it is more suited to "highly illiquid," risky income from real estate than the Treasury Bill rate suggested by Zeke's expert. But it does not explain why the court's decision to use the Treasury Bill rate was an abuse of discretion, other than to state that its use is "contrary to reason and the available evidence."

¶ 53 The record, however, suggests otherwise. Zeke's expert testified that the Treasury Bill rate was "a very good way to measure the time value of money" in this case. It was for the district court to determine which expert's testimony to use in selecting the appropriate rate. *See Borer v. Lewis*, 91 P.3d 375, 383 (Colo.2004) (" 'It is the function of the trial court, and not the reviewing court, to weigh evidence and determine the credibility of the witnesses.' " (quoting *People v. Pitts*, 13 P.3d 1218, 1221 (Colo. 2000))). Additionally, the Treasury Bill rate has been recognized as a valid method for discounting future cash flows to present value. *See Liriano*, 960 F.Supp. at 45–46.

¶ 54 Because Pappas–Alstad has not shown why the application of the Treasury Bill rate was arbitrary, unreasonable, or unfair, we discern no reason to disturb the court's use of that rate instead of the one suggested by Pappas–Alstad's expert. *See Hudak v. Med. Lien Mgmt., Inc.*, 2013 COA 83, ¶ 8, 305 P.3d 429 (Under an abuse of discretion standard, "we do not consider whether we would have reached a different result, but only whether the district court's decision fell within the range of reasonable options.").

## III. Zeke's Cross–Appeal

¶ 55 Because we conclude that the court did not abuse its discretion in calculating the restitution owed to Zeke, we need not consider Zeke's conditional cross-appeal.

## IV. Attorney Fees on Appeal

¶ 56 Zeke requests—and is entitled to—an award of attorney fees incurred on appeal

pursuant to the attorney fee provision of the lease and section 13–40–123, C.R.S.2014. Because the district court is better situated to address the necessary factual determinations related to the attorney fee request, we exercise our discretion under C.A.R. 39.5 and direct the district court on remand to award Zeke a reasonable amount of attorney fees incurred on appeal.

### V. Conclusion

¶ 57 The district court's order is affirmed, and the case is remanded to the district court with directions to award Zeke a reasonable amount of attorney fees incurred in this appeal.

JUDGE LICHTENSTEIN and JUDGE FOX concur.

