**SHELBY RESOURCES, LLC, and Caddis Resources, Inc., Plaintiffs–Appellants and Cross–Appellees,**

v.

**WELLS FARGO BANK, National Association, Defendant–Appellee and Cross–Appellant.**

No. 05CA2022.

Colorado Court of Appeals, Div. I.

March 22, 2007.

Scott & Associates, P.C., Jeffrey J. Scott, Denver, Colorado, for Plaintiffs–Appellants and Cross–Appellees.

Brown, Berardini & Dunning, P.C., Brian J. Berardini, C. Read Sawczyn, Denver, Colorado, for Defendant–Appellee and Cross–Appellant.

Opinion by Judge ROY.

Plaintiffs, Shelby Resources, LLC and Caddis Resources, Inc., appeal the trial court's judgment limiting their damages against defendant, Wells Fargo Bank, National Association (the bank), for the bank's untimely payment of a sight draft issued by Caddis. The bank cross-appeals the trial court's ruling that plaintiffs' common law claims were not preempted by the Colorado Uniform Commercial Code (UCC) and that Shelby, not being a customer of the bank or party to the sight draft, has no standing. We affirm.

On December 1, 2003, Shelby obtained an extension of an oil and gas lease from mineral lessors. As consideration for the extension, Caddis issued a thirty-day sight draft in favor of the mineral lessors in the amount of $1,600. On or about December 3, 2003, the mineral lessors endorsed the sight draft and deposited it into their bank. The mineral lessors' bank then mailed its collection letter to the bank and instructed it to issue a check to the mineral lessors for payment of the sight draft.

On December 10, 2003, the bank telecopied its incoming collection item notification and payment instructions to Caddis, stating that the due date of the sight draft was January 7, 2004, and requested that Caddis provide payment instructions. The telecopy indicated that any payments received after 1 p.m. PST would be processed the following business day. On January 6, 2004, Caddis telecopied the form back to the bank with instructions to pay the sight draft on January 7, 2004.

The sight draft stated in a form approximating a check:

COLLECT DIRECTLY THROUGH [the bank] [address]

*Thirty (30)* Days After Sight and Subject to Approval of Title

Pay to the Order of *[mineral lessors]* *$1600.00**

*Sixteen Hundred and 00/100 DOLLARS*

Consideration for *Extension of Oil and Gas Lease, Dated April 16, 2003*

To: Caddis Resources, Inc., [address]

(Emphasis indicates entries on blanks on a preprinted form.) Caddis maintained a checking account with the bank from which the funds were to be withdrawn and paid.

In a letter dated January 10, 2004, the bank advised Caddis that it had honored its request for payment of the sight draft, that it charged $1,645 to Caddis's account, and that "the proceeds ha[d] been paid to the party making the request." On January 12, 2004, the bank stamped the sight draft as paid and funded it from Caddis's account. On January 16, 2004, the bank obtained the necessary wiring instructions from the mineral lessors' bank and wired the proceeds to the mineral lessors' account. The mineral lessors' bank rejected the funds, and the lessors leased the mineral estate to another party.

On May 28, 2004, plaintiffs filed a complaint alleging that because the bank had failed to timely pay the sight draft, the oil and gas lease was not extended and Shelby had been damaged in excess of $4,000,000. Specifically, plaintiffs' complaint asserts claims for (1) violation of provisions of the UCC; (2) negligence; (3) breach of fiduciary duty; (4) breach of contract; and (5) promissory estoppel.

Both parties filed motions for summary judgment, which the trial court denied. However, the trial court granted a motion in limine filed by the bank limiting plaintiffs' damages to the face amount of the sight draft, $1,600, because it concluded that the bank was a "collecting bank" under the UCC. The parties then filed, and the trial court granted, a joint motion for entry of stipulated final judgment under C.R.C.P. 54(a) in the amount of $1,600, reserving appellate rights. This appeal followed.

## I.

Plaintiffs first assert that the trial court erred in finding that the bank was a "collecting bank" rather than a "payor bank" within the terms of the UCC. We disagree.

We review statutory interpretation de novo. *Vigil v. Franklin,* 103 P.3d 322 (Colo. 2004).

A draft is defined as "[a]n unconditional written order signed by one person (the drawer) directing another person (the drawee or payor) to pay a certain sum of money on demand or at a definite time to a third person (the payee) or to bearer. A check is the most common example of a draft." *Black's Law Dictionary* 530 (8th ed.2004). A sight draft is a type of draft that is "payable on the bearer's demand or on proper presentment to the drawer." *Black's, supra,* at 530. By its terms, payment of the sight draft in question was conditioned on approval of title, which required further authorization from Caddis before payment.

At the outset, the UCC establishes rules for the handling of drafts and imposes time limits within which banks must act on checks or drafts presented for payment. One such deadline is the "midnight deadline," which is defined as "midnight on [a bank's] next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." Section 4–4–104(a)(10), C.R.S.2006. Checks and other drafts presented to a bank must be acted on, paid, returned, or settled by a payor or collecting bank by the "midnight deadline." *See generally* §§ 4–4–301, 4–4–302, C.R.S.2006.

Section 4–4–105(3), C.R.S.2006, defines a "payor bank" as "a bank that is the drawee of a draft," and under § 4–4–104(a)(8), C.R.S. 2006, a "drawee" is the "person ordered in a draft to make payment." Section 4–4–105(5), C.R.S.2006, defines a "collecting bank" as a "bank handling an item for collection except the payor bank." *See also* John S. Herbrand, *Construction of UCC § 4–105, Which Defines "Payor Bank," "Collecting Bank," and the Like,* 84 A.L.R.3d 1073, § 9 (1978). Drawers can use "payable through" or "pay-able at" to, as here, place conditions on the payment of a draft.

Section 4–4–106, C.R.S.2006, provides that a bank is a collecting bank in the following circumstances:

(a) If an item states that it is "payable through" a bank identified in the item, (i) the item designates the bank as a collecting bank and does not by itself authorize the bank to pay the item, and (ii) the item may be presented for payment only by or through the bank.

(b) If an item states that it is "payable at" a bank identified in the item, (i) the item designates the bank as a collecting bank and does not by itself authorize the bank to pay the item, and (ii) the item may be presented for payment only by or through the bank.

(c) If a draft names a nonbank drawee and it is unclear whether a bank named in the draft is a co-drawee or a collecting bank, the bank is a collecting bank.

The classification of a bank, in turn, determines its liability for mishandling a draft or item. For example, if a collecting bank fails to exercise ordinary care, a party's damages are limited to the amount of the item minus the amount that could not have been realized by the exercise of ordinary care. However, when the collecting bank acts in bad faith, consequential damages are awardable. Section 4–4–103(e), C.R.S.2006. By contrast, a payor bank is liable for actual and consequential damages if it fails to meet its midnight deadline for paying, returning, or sending notice of dishonor of an item. Sections 4–4–302, 4–4–402, C.R.S.2006; *Am. Nat'l Bank & Trust Co. v. Cent. Bank,* 132 B.R. 171 (D.Colo.1991).

There are two lines of authority for determining whether a bank is a payor or collecting bank. The majority of courts consider the terminology of the instrument as dispositive. In *Aetna Casualty & Surety Co. v. Traders National Bank & Trust Co.,* 514 S.W.2d 860 (Mo.Ct.App.1974), for example, an attorney forged his client's endorsement on a settlement draft and then deposited the settlement in his own bank account. The attorney's bank then forwarded the draft to a second bank, and the draft stated that it

would be "payable through" the second bank. The court determined that the "payable through" language meant that the second bank was a collecting bank. The court held:

> [C]ommercial instruments such as this draft must be governed by the terminology used therein rather than by extraneous factors and actions which are not and cannot be reflected on the face of these instruments. This is particularly true when the paper in question uses terminology which has been defined by a uniform statute ... having for its very purpose the fixing of firm and definite rights and obligations throughout the business world.

*Aetna Cas. & Sur. Co. v. Traders Nat'l Bank & Trust Co., supra,* 514 S.W.2d at 864 (quoting 11 Am.Jur.2d Bills and Notes § 62, at 86 (1963)); *see also Messeroff v. Kantor,* 261 So.2d 553, 555 (Fla.Dist.Ct.App.1972) ("The commercial practice of making drafts payable at or through a particular bank is recognized by the code ... which clearly indicates that [an] instrument[ ] 'payable through' a bank or the like designates that bank as a collecting bank to make presentment, but does not of itself authorize the bank to pay the instrument."); *Aetna Cas. & Sur. Co. v. Fennessey,* 37 Mass.App.Ct. 668, 642 N.E.2d 1050, 1052 (1994) ("A 'payable through' draft must be clearly indicated as such by the word(s) 'through' or 'payable through' appearing before the name of the collecting bank through which the draft is payable."); *Mfrs. Nat'l Bank v. Sutherland,* 16 Mich.App. 286, 167 N.W.2d 894, 896 (1969) ("The key words 'payable through [the bank],' are found on the face of the instrument in question. These words ... grant [the bank] the status of a 'collecting bank' rather than that of a 'payor bank.' "); *Clawson v. Berklund,* 188 Mont. 48, 610 P.2d 1168, 1170 (1980) ("[The bank] is a collecting bank ... by virtue of the collect directly 'through' language."); *Engine Parts, Inc. v. Citizens Bank,* 92 N.M. 37, 582 P.2d 809, 812 (1978) ("The status of a negotiable instrument is to be determined from its face from the language used or authorized to be used thereon by its drawer or maker and not from documents attached thereto by other parties."); *Reynolds–Wilson Lumber Co. v. Peoples Nat'l Bank,* 699 P.2d 146, 150 (Okla. 1985) ("The construction to be given the draft is to be ascertained from the face of the draft itself.").

Plaintiffs argue that we should, in essence, evaluate the matter on a functional basis. That is, the bank was the last bank in the chain of banks through which the sight draft was negotiated, and the sight draft was to be funded from funds on deposit with the bank. According to plaintiffs, the bank is, therefore, the last stop in that chain and is a payor bank. Although a minority view would appear to support plaintiffs' argument, ultimately we reach the same result because the bank here needed the consent of the issuer to pay the item. In *Southern Cotton Oil Co. v. Merchants National Bank,* 670 F.2d 548 (5th Cir.1982), a plaintiff argued that a bank was a payor bank because the issuer of the sight draft maintained its accounts there. However, the court held that because the bank did not, without more, have authority to charge the issuer's account for payment of the draft, it was a collecting bank. *See also Whitehall Packing Co. v. First Nat'l City Bank,* 55 A.D.2d 675, 390 N.Y.S.2d 189 (N.Y.App.Div. 1976).

Here, the sight draft contained the language "collect directly through [the bank]," which denominates the bank as a "collecting bank" under the first analysis. The bank was also a collecting bank under the second analysis because it required Caddis's approval before making payment.

The UCC is to be construed so as to make the law uniform among the various jurisdictions. Section 4–1–103(a)(3), C.R.S.2006. The majority of the courts considering the issue have concluded that the language of the instrument controls. In light of the admonition of § 4–1–103(a)(3), and the relatively short time after the receipt of the item that a bank has to determine its obligations, we conclude that the language of the instrument controls the determination of whether a bank is a "collecting bank" or "payor bank."

Therefore, we agree with the trial court that the bank was a collecting bank and its liability for mishandling the item is limited to the face value of the draft.

## II.

■ Plaintiffs next assert that the trial court erred in ruling that their common law negligence claim was displaced by the UCC. We disagree.

■ "[W]here the interaction of common law and statutory law is at issue, we acknowledge and respect the General Assembly's authority to modify or abrogate common law, but can only recognize such changes when they are clearly expressed." *Vigil v. Franklin, supra,* 103 P.3d at 327; *see also Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070 (Colo.1992) (because statutes in derogation of the common law must be strictly construed, if the General Assembly intends to abrogate rights that would otherwise be available under the common law, it must manifest that intent expressly or by clear implication).

The UCC provides that "[u]nless displaced by the particular provisions of this title, the principles of law and equity ... shall supplement its provisions." Section 4–1–103(b), C.R.S.2006. The stated objective of § 4–1–103(b) is "(1) [t] o simplify, clarify, and modernize the law governing commercial transactions; (2)[t]o permit the continued expansion of commercial practices through custom, usage, and agreement of the parties; and (3)[t]o make uniform the law among the various jurisdictions." Section 4–1–103(a), C.R.S.2006.

Here, the UCC establishes a standard of ordinary care, and specifies the damages for breach of that standard. Section 4–4–202, C.R.S.2006, sets forth in detail a bank's obligation to exercise ordinary care:

(a) A collecting bank must exercise ordinary care in:

(1) Presenting an item or sending it for presentment;

(2) Sending notice of dishonor or nonpayment or returning an item other than a documentary draft to the bank's transferor after learning that the item has not been paid or accepted, as the case may be;

(3) Settling for an item when the bank receives final settlement; and

(4) Notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof.

(b) A collecting bank exercises ordinary care under subsection (a) of this section by taking proper action before its midnight deadline following receipt of an item, notice, or settlement. Taking proper action within a reasonably longer time may constitute the exercise of ordinary care, but the bank has the burden of establishing timeliness.

■ When analyzing whether the UCC displaces a common law negligence claim with respect to bank deposits and collections, we first note that an objective of the UCC is to displace scattered legislation or decisional law, and to state as fully as practicable a comprehensive and workable set of rules and principles for the governing of all aspects of transactions in the field to which it applies. Section 4–1–103(b). In addition, by its own language, the UCC does not purport to displace the entire body of common law. Section 4–1–103(a). Accordingly, when the UCC prescribes particular standards of care or limitations on liability, "the common law is annulled to the extent it modifies these standards or changes these limitations." *Salazar v. Clancy Sys. Int'l, Inc.,* 155 P.3d 488, 490 (Colo.App.2006) (quoting *Equitable Life Assurance Soc'y v. Okey,* 812 F.2d 906, 909 (4th Cir.1987)).

■ Courts have concluded, based on these principles, that the UCC does not displace the common law of torts unless reliance on the common law would "thwart the purposes of the Code." *New Jersey Bank v. Bradford Sec. Operations, Inc.,* 690 F.2d 339, 346 (3d Cir.1982). When a common law negligence claim and the UCC claim necessitate the same legal analysis, there is a suggestion "that the Code cause of action comprehensively covers the field of legal theories." *Equitable Life Assurance Soc'y v. Okey, supra,* 812 F.2d at 909. If duplicative legal analysis would be allowed, variations in the common law among the states could destroy the uniformity in commercial transactions sought to be accomplished by the UCC. *Equitable Life Assurance Soc'y v. Okey, supra.* Therefore, where the UCC provides a comprehensive

remedy, a common law action is displaced. *New Jersey Bank v. Bradford Sec. Operations, Inc., supra.*

In *Sebastian v. D & S Express, Inc.*, 61 F.Supp.2d 386 (D.N.J.1999), the court applied these principles to the issue of whether the ordinary care standard relating to bank deposits and collections displaced common law negligence. The court held, "The UCC requires a prima facie presentation of failure to exercise ordinary care and causation almost identical to what common law negligence would require.... It follows then that here, the plaintiffs' action of common law negligence is barred because the UCC provides a comprehensive remedy." *Sebastian v. D & S Express, Inc., supra,* 61 F.Supp.2d at 391 (citation omitted); *see also Childs v. Fed. Reserve Bank,* 719 F.2d 812, 815 (5th Cir.1983) ("We find that section 4.202 of the Texas UCC [comparable to § 4–4–202 of the Colorado UCC] displaces any common law cause of action based on violation of the duties outlined in that provision."); *City of Wellston v. Jackson,* 965 S.W.2d 867, 869 (Mo.Ct.App.1998) ("The U.C.C. preempts the claims and defenses regulating negotiable instruments, bank deposits and collections."); cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Devon Bank,* 702 F.Supp. 652, 660 (N.D.Ill.1988) ("It is clear that the duty of ordinary care in UCC section 4–202 does not displace negligence; if anything, section 4–202 is a restatement of the negligence standard.").

Section 4–4–202 requires a failure to exercise ordinary care and causation almost, if not totally, identical to that which a common law negligence claim would require. Therefore, because common law negligence and the UCC ordinary care standard applicable to bank deposits and collections necessitate the same legal analysis, we conclude that the UCC displaces a common law negligence claim in this area.

### III.

Plaintiffs next assert that because the bank acted in bad faith, the trial court erred in finding that their claims under the UCC and common law are subject to the damage limitations imposed by the Colorado UCC, the face amount of the sight draft, $1,600.

More specifically, in their reply brief, plaintiffs assert that on remand they would present evidence in the trial court "that there is substantial evidence that [the bank] acted in bad faith in its failure to timely pay the Sight Draft." Plaintiffs appear to premise this assertion on the letter sent to them by the bank stating that the sight draft had been paid when, in fact, it had not, and they argue that an allegation of bad faith is somehow inherent in their UCC and breach of fiduciary duty claims.

However, because bad faith was not alleged in the trial court and was not raised on appeal until the reply brief, we decline to address this issue further. *See Estate of Stevenson v. Hollywood Bar & Cafe, Inc.,* 832 P.2d 718 (Colo.1992).

### IV.

In light of our resolution of plaintiffs' appeal, we need not address the bank's argument on cross-appeal that Shelby lacked standing and that plaintiffs' remaining common law claims are displaced by the UCC. In the parties' motion for entry of a stipulated final judgment pursuant to C.R.C.P. 54(a), they agreed:

> If the Court of Appeals grants all of part of [p]laintiffs' appeal regarding the [court's] rulings on the summary judgment motions and/or the motion in limine and remands the case for trial, then the parties shall revert to their respective positions existing prior to the date of this [j]oint [m]otion for [e]ntry of [s]tipulated [f]inal [j]udgment.

Here, plaintiffs have not prevailed on appeal. Therefore, as we read the stipulation, there are no issues remaining to the decided.

The judgment is affirmed.

MÁRQUEZ and FURMAN, JJ., concur.