2016 COA 192M

**Gerald ROME, Securities Commissioner for the State of Colorado, Plaintiff-Appellee,**

v.

**Mark MANDEL and Wall Street Radio, Inc., d/b/a Winning on Wall Street, Defendants-Appellants.**

**Court of Appeals No. 15CA2033**

Colorado Court of Appeals,
Div. III.

Announced December 29, 2016

As Modified on Denial of Rehearing
January 26, 2017

388

Cynthia H. Coffman, Attorney General, Russell B. Klein, Deputy Attorney General, Sueanna P. Johnson, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Jones & Keller, P.C., David Zisser, Denver, Colorado, for Defendants-Appellants

Vorndran Shilliday, P.C., Paul Vorndran, Denver, Colorado; Zachary Knepper, Washington, D.C., for Amicus Curiae North American Securities Administrators Association, Inc.

Opinion by JUDGE NAVARRO

¶ 1 The Securities Commissioner of Colorado, Gerald Rome, brought this civil enforcement action under the Colorado Securities Act (CSA), §§ 11–51–101 to –908, C.R.S. 2016, against defendants, Marc Mandel and Wall Street Radio, Inc. d/b/a Winning on Wall Street (WSR). The Commissioner al-

leged that defendants had transacted business as investment advisers or investment adviser representatives without a license or exemption from licensure. According to the Commissioner, they did so by: (1) responding to direct investment questions from clients through a service called "crystal ball readings"; and (2) effectively executing securities trades on behalf of their clients through a practice known as "auto-trading."

¶ 2 The trial court entered summary judgment in favor of the Commissioner, holding that defendants could not engage in those activities without a license. As a result, the court imposed a permanent injunction and entered a restitution order against defendants.

¶ 3 On appeal, defendants raise three novel questions. First, by acting as a so-called "lead trader" for an auto-trading platform, does one act as an investment adviser required to be licensed under the CSA? Second, if so, is this licensing requirement consistent with the actor's First Amendment rights? Third, may the Commissioner seek as restitution the fees paid by the unlicensed investment advisor's clients? The answer to all three questions is "yes." Therefore, we affirm the summary judgment and the restitution order. But we vacate the injunction in part and reverse it in part. And we remand with directions.

### I. Factual and Procedural History

#### A. Undisputed Facts

¶ 4 The trial court recognized, and the record confirms, the following undisputed facts. Defendants, based in Boulder, Colorado, hosted a radio show devoted to securities and investments. They also maintained a website offering a variety of investment-related services under two membership plans: the Master Membership Plan and the Lead Trader Membership Plan.

¶ 5 Subscribers to the Master Membership Plan paid $500 annually to receive defendants' electronic newsletter, daily trading ideas, seminars, online access to defendant's trading system and portfolio, and—as relevant to this case—the opportunity to call or e-mail Mandel twice a week with questions about specific stocks (called "crystal ball readings"). Subscribers to the Lead Trader Membership Plan paid between $1000 and $2000 annually to receive the Master Membership Plan services and the opportunity to mimic Mandel's own security trades through an investment vehicle known as auto-trading.

¶ 6 Auto-trading is a system whereby investors (the followers) mimic the trades of a single investor (the lead trader). *See Sec. & Exch. Comm'n v. Terry's Tips, Inc.*, 409 F.Supp.2d 526, 529–30 (D. Vt. 2006). All investors—lead trader and followers alike—open separate accounts with a broker-dealer that provides an auto-trading platform. The lead trader then grants followers permission to mimic his or her trades. Finally, followers authorize the broker-dealer to execute the same transactions in their accounts as those of the lead trader. Consequently, when the lead trader initiates a transaction for his or her account, the broker-dealer automatically executes the same transaction in the followers' accounts, without need for further instruction or approval. Followers are often not aware of the trades until after they have occurred. *Id.* at 530.

¶ 7 Mandel and his Lead Trader Membership subscribers employed as the broker-dealer a company called Ditto Trade, which provides an online auto-trading platform through its website.[1] Under the Ditto Trade model, a follower may choose certain controls limiting the extent to which the follower's account mimics the lead trader's transactions (e.g., the follower can exclude identified securities from being traded or limit the investment amount that will follow the lead trader's transactions). Alternatively, the follower can select the "ditto all" or "full throttle" option, wherein the follower's entire investment account may be used to buy and sell

---

1. The record also shows that Mandel holds an interest in Ditto Trade separate from that of his role as a lead trader: he entered into multiple joint ventures and consulting agreements with Ditto Trade, and pledged to raise substantial funds for the company. Mandel sent e-mails and other communications to multiple clients recommending their purchase of Ditto Trade stock, and he hosted cocktail parties to promote the investment.

securities in the same proportion as that of the lead trader.[2]

¶ 8 Ditto Trade requires lead traders to attest that they are either registered investment advisers or are exempt from registration. Mandel attested to operating within an exemption.

### B. The Prior Administrative Action

¶ 9 Neither Mandel nor WSR has ever been licensed in Colorado as an investment adviser or investment adviser representative. Mandel's earlier attempt to gain such a license resulted in an administrative action before the Commissioner in 2008. Mandel allegedly failed to make complete and accurate disclosures in his application materials; he did not disclose: (1) a nondischarged bankruptcy; (2) a number of judgments, arbitration matters brought by former clients, and a California regulatory action brought against his insurance license; and (3) his discipline by the National Association of Securities Dealers.

¶ 10 The administrative action ended in a stipulated consent order. Therein, the Commissioner denied Mandel's application, precluded him from reapplying for ten years, and barred him from acting as a solicitor or otherwise associating with any Colorado licensed investment adviser or "federal covered" adviser.[3]

### C. The Present Action

¶ 11 The Commissioner initiated the present district court action against Mandel and WSR in October 2014. The Commissioner alleged that defendants had acted as unlicensed investment advisers or investment adviser representatives, contrary to CSA section 11–51–401(1.5), C.R.S. 2016. Specifically, defendants managed clients' securities transactions through the auto-trading platform,

and defendants provided "direct-to-client" advice through bi-weekly crystal ball readings. Defendants responded that they were exempt from licensure under the "newsletter exclusion" set forth in section 11–51–201(9.5)(b)(III), C.R.S. 2016.

¶ 12 Discerning no genuine issue of material fact, the trial court granted summary judgment against defendants. The court noted that, although defendants "may have engaged in some exempt publishing activities, they provided personalized money management for which a license is required." Specifically, defendants used the lead trader service to provide information to followers "as to the advisability of purchasing and selling securities through the trades in [their] own accounts," and defendants used the crystal ball service to provide "individual advice regarding the advisability of buying and selling securities to clients." The court concluded that this conduct "squarely met the definition of investment adviser and investment adviser representative," as provided under section 11–51–201(9.5)(a)(I) and (9.6)(a), and that defendants did not qualify for any exemption from the licensure requirement.

¶ 13 The court entered a permanent injunction under section 11–51–602(1), C.R.S. 2016—effectively barring defendants from any involvement in the securities industry in Colorado—and directed them to pay $80,000 in restitution, reflecting $1000 for each auto-trading subscriber.

### II. Summary Judgment

¶ 14 Defendants contend that the trial court erroneously entered summary judgment against them for two reasons. First, defendants argue that a genuine issue of material fact exists as to whether they acted as investment advisers or investment adviser representatives. Second, they assert that

---

**2.** The Commissioner offers the following example: "[I]f Mandel made a trade of 100 shares of IBM stock in his Lead Trader account, and he had five Followers set to full throttle and the followers have the money available to execute the trade, the Ditto Trade platform would automatically buy an identical amount of shares of IBM stock for the Followers and deposit them into the Followers' brokerage accounts." Defendants do not dispute the validity of this example.

**3.** As explained in the consent order, "association" meant "being a partner, officer, director of an investment adviser, or person performing similar functions, or an employee or agent of an investment adviser, or any person directly or indirectly controlling, or controlled by, an investment adviser."

summary judgment was inappropriate because the Commissioner failed to controvert defendants' affirmative defense that the First Amendment of the Federal Constitution and article II, section 10 of the Colorado Constitution barred this enforcement action.

### A. Standard of Review and Summary Judgment Principles

¶ 15 We review de novo an order granting summary judgment. *People v. Wunder*, 2016 COA 46, ¶ 13, 371 P.3d 785. In de novo review, we do not defer to the trial court's view of the written filings or any other documentary evidence, but instead we consider them anew. *See Ringquist v. Wall Custom Homes, LLC*, 176 P.3d 846, 849 (Colo. App. 2007).

¶ 16 A court may not grant summary judgment except on a clear showing that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1339–40 (Colo. 1988). A material fact is one that "will affect the outcome of the case." *People in Interest of S.N.*, 2014 COA 116, ¶ 23, 338 P.3d 508 (quoting *Dominguez Reservoir Corp. v. Feil*, 854 P.2d 791, 795 (Colo. 1993)).

¶ 17 The moving party bears the initial burden of production to show that no genuine issue of material fact exists, and a court must resolve all doubts as to the existence of such an issue against the moving party. *Churchey*, 759 P.2d at 1340. If the moving party would not bear the burden of persuasion at trial, the moving party must show an absence of evidence in the record to support the nonmoving party's case. *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 712 (Colo. 1987).

¶ 18 If the moving party meets its burden, the burden shifts to the nonmoving party to establish that a genuine dispute of material fact exists. *Id.* at 713; *S.N.*, ¶ 27. In that event, "an adverse party may not rest upon the mere allegations or denials of the opposing party's pleadings, but the opposing party's response by affidavits or otherwise ..., must set forth specific facts showing that there is a genuine issue for trial." C.R.C.P. 56(e).

### B. Burden of Production

¶ 19 With his motion for summary judgment, the Commissioner submitted an array of evidence supporting his claims: e-mail communications between Mandel and clients that constituted crystal ball readings; a spreadsheet listing defendants' auto-trading followers on Ditto Trade; communications and paperwork between Mandel and Ditto Trade personnel (e.g., auto-trading platform descriptions, Mandel's attestation, consulting agreements); the 2008 consent order between Mandel and the Commissioner; a letter to the Colorado Attorney General from Ditto Trade's general counsel describing the services afforded by the auto-trading platform; defendants' responses to discovery requests; and defendants' advertisements for their services. In response, defendants submitted three exhibits: their first set of discovery requests, an affidavit by their attorney regarding the Commissioner's failure to confer in advance of filing his motion for summary judgment, and the letter from Ditto Trade's general counsel describing its auto-trading platform.

¶ 20 Defendants identify only one disputed fact: whether they based their services on their subscribers' individual portfolios or specific investment needs. As we shall explain, however, that fact does not affect the outcome of this case.

¶ 21 Defendants' other contentions raise matters of law (e.g., whether this enforcement action violates the First Amendment). But those contentions do not suggest that additional material evidence exists which contradicts the Commissioner's evidence. The record and the briefs reveal, therefore, that the Commissioner presented undisputed facts sufficient to resolve this case, including defendants' affirmative defense. Accordingly, we turn to whether the Commissioner is entitled to judgment as a matter of law.

### C. Relevant Law

¶ 22 Section 11–51–401(1.5) provides that "[a] person with a place of business in this state shall not transact business in this state as an investment adviser or investment ad-

viser representative unless such person is licensed as such or exempt from licensing under section 11–51–402." (No one suggests that section 11–51–402, C.R.S. 2016, applies here.) An "investment adviser" includes, as relevant here,

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

§ 11–51–201(9.5)(a)(I). An "investment adviser representative" means, as relevant here, one who is a partner, officer, or director of an investment adviser; or who is employed or otherwise associated with an investment adviser; and who makes recommendations or otherwise renders advice to clients regarding securities, manages securities accounts or portfolios for clients, or determines which recommendation or advice regarding securities should be given to clients. § 11–51–201(9.6)(a).

¶ 23 But an "investment advisor" does not include:

> (II) A publisher of a bona fide newspaper, magazine, or business or financial publication with a regular paid circulation; [or]
>
> (III) A publisher of a securities advisory newsletter with a regular and paid circulation who does not provide advice to subscribers on their specific investment situations[.]

§ 11–51–201(9.5)(b). These provisions form the so-called "publishers exclusion" or "newsletter exclusion" from the basic definition of an investment adviser. This case turns on whether this exclusion exempts defendants from licensure.

¶ 24 The General Assembly modeled the CSA's regulation of investment advisors' on the 1956 Uniform Securities Act and 1985 Revised Uniform Securities Act. These uniform acts were designed to be consistent with the Federal Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–1 to 80b–21 (2012),

and the United States Supreme Court's interpretation of that act. Revised Unif. Sec. Act of 1985 § 101 cmt. 8 (amended 1988), 7C U.L.A. 228 (2006). In fact, the CSA's basic definition of investment advisor is identical to the federal act's definition. *See* 15 U.S.C. § 80b–2(a)(11) (2012).

■ ¶ 25 Because the CSA's regulation of investment advisers largely parallels the federal act's provisions, "federal authorities are highly persuasive." *Lowery v. Ford Hill Inv. Co.*, 192 Colo. 125, 129–30, 556 P.2d 1201, 1204 (1976); *Rome v. HEI Res., Inc.*, 2014 COA 160, ¶ 19, —— P.3d ——; *see also* § 11–51–101(3), C.R.S. 2016 ("The provisions of this article and rules made under this article shall be coordinated with the federal acts and statutes to which references are made in this article[.]"); § 11–51–402(5)(a)(I) (referring to the Federal Investment Advisers Act of 1940 when discussing exemptions from registration for investment advisers); *Joseph v. Equity Edge, LLC*, 192 P.3d 573, 578–79 (Colo. App. 2008) (relying on federal authority to determine whether defendants acted as investment advisers for purposes of CSA).

¶ 26 For these reasons, the trial court and the parties have properly focused on the seminal case of *Lowe v. Securities & Exchange Commission*, 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985). In *Lowe*, the Supreme Court considered whether the Securities and Exchange Commission (SEC) could obtain an injunction forbidding the publication of a financial newsletter by unregistered parties. *Id.* at 183, 105 S.Ct. 2557. Although the Court granted review to determine whether the First Amendment (particularly its protection of the free press) prohibited the injunction, the Court ultimately resolved the case on statutory grounds. *Id.* at 188–90, 211, 105 S.Ct. 2557. The Court interpreted the Investment Advisers Act in a manner that avoided the constitutional question—that is, the Court adopted a construction of the statute that rendered it clearly valid under the constitution. *See id.; see also Crowell v. Benson*, 285 U.S. 22, 76, 52 S.Ct. 285, 76 L.Ed. 598 (1932) (Brandeis, J., dissenting) ("[W]here a statute is equally susceptible of two constructions, under one of which it is clearly valid and under the other

of which it may be unconstitutional, the court will adopt the former construction."); *Jolly v. People*, 742 P.2d 891, 897 (Colo. 1987) (same).

¶ 27 In particular, the Court construed the statutory exemption for bona fide publications broadly and concluded that the petitioners fell within that exclusion.[4] The Court explained:

> The legislative history plainly demonstrates that Congress was primarily interested in regulating the business of rendering personalized investment advice, including publishing activities that are a normal incident thereto. On the other hand, Congress, plainly sensitive to First Amendment concerns, wanted to make clear that it did not seek to regulate the press through the licensing of nonpersonalized publishing activities.

*Lowe*, 472 U.S. at 204, 105 S.Ct. 2557. Thus, as long as the communications between the publisher and subscribers are entirely impersonal and do not develop into the kind of fiduciary, person-to-person relationships that were discussed in the legislative history of the federal act and that are characteristic of investment adviser-client relationships, the publications are, at least presumptively, within the exclusion and not subject to registration. *Id.* at 210, 105 S.Ct. 2557.

¶ 28 After concluding that the *Lowe* petitioners met the basic definition of investment adviser, the Court examined the language of the statutory exclusion for bona fide publications to determine whether the petitioners were nonetheless not subject to regulation (i.e., whether their activities were "nonpersonalized"). *See id.* at 203–04, 208–09, 105 S.Ct. 2557; *see also Sec. & Exch. Comm'n v. Park*, 99 F.Supp.2d 889, 894 (N.D. Ill. 2000) ("[W]hether or not a publication is personalized for purposes of the Advisers Act is determined in large part by whether or not the publication can fall into an exclusion for nonpersonalized or general publications."). The federal act's exclusion applies to "the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation." 15 U.S.C. § 80b–2(a)(11)(D).

¶ 29 The Court interpreted a "bona fide" publication to mean "genuine in the sense that it would contain disinterested commentary and analysis as opposed to promotional material disseminated by a 'tout.'" *Lowe*, 472 U.S. at 206, 105 S.Ct. 2557. The Court interpreted "regular" as meaning "offered ... on a regular schedule," as opposed to being "timed to specific market activity, or to events affecting or having the ability to affect the securities industry." *Id.* at 206, 209, 105 S.Ct. 2557. If a publication meets these requirements (among others), the publisher's communication is not sufficiently personalized for regulation. *Id.* at 206–09, 105 S.Ct. 2557; *see also Park*, 99 F.Supp.2d at 895–96. Conversely, if the publisher's activities fail to satisfy any of these requirements—and the publisher otherwise comes within the basic definition of investment adviser—the publisher must register as an investment adviser.

### D.  Application

¶ 30 The trial court determined that defendants met the basic definition of an "investment adviser" and/or "investment adviser representative" under the CSA. *See* § 11–51–201(9.5)(a)(I), (9.6)(a). Defendants offer no contrary argument. And the undisputed facts show that defendants engaged in the business of advising others as to the buying and selling of securities through indirect communications (e.g., daily stock ideas and webinars), with direct communications (crystal ball readings), and by providing paying subscribers the opportunity to mimic Mandel's investment transactions through auto-trading. *See also In the Matter of Weiss Research, Inc.*, Investment Advisers Act Release No. 2525, 88 SEC Docket 810, 2006 WL 1725099, at *5 (June 22, 2006) (reflecting the SEC's conclusion that acting as a lead trader on an auto-trading platform meets the basic

---

4.  Concurring in the result, Justice White adopted a much narrower construction of the statutory exclusion, found that the exclusion did not exempt the petitioners from registration as investment advisers, and concluded that this registration requirement violated the First Amendment. *See Lowe v. Sec. & Exch. Comm'n*, 472 U.S. 181, 211–36, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985) (White, J., concurring in the result).

definition of an investment adviser under the Federal Investment Advisers Act).[5]

¶ 31 In sum, to avoid the licensing requirement, defendants must fall within an exclusion to the basic definition of investment adviser. *Cf. Park*, 99 F.Supp.2d at 895. As noted, they rely on the publishers or newsletter exclusion. *See* § 11–51–201(9.5)(b)(II)–(III). To avail themselves of these protections, defendants' services at issue—the lead trader service and crystal ball readings—must qualify as bona fide publications or newsletters with a regular circulation. *See id.*

### 1. Lead Trader Service

■ ¶ 32 Defendants disseminated investment advice under their lead trader service by effectively exercising discretion over part or all of their subscribers' accounts with Ditto Trade. For the following three reasons, this investment advice did not meet all requirements of either section 11–51–201(9.5)(b)(II) or section 11–51–201(9.5)(b)(III). The advice, therefore, was sufficiently personalized to require a license under the CSA, regardless of whether defendants based the advice on the subscribers' individual portfolios or financial goals.

■ ¶ 33 First, the lead trader services did not take the form of a "publication" or "newsletter" generally disseminated to subscribers. Defendants do not contend otherwise. Instead, they assert that, because they offered a newsletter with the subscriptions, all of their other services—including the lead trader service—fall within the safety net of section 11–51–201(9.5)(b)(II)–(III). But accepting this assertion would prove too much. Merely publishing a newsletter allegedly compliant with the exclusion does not give the publisher carte blanche to offer *other* services that do not satisfy the exclusion and would require an investment adviser license. "Regardless of whether the Defendants as publishers of a financial newsletter of general and regular circulation are excluded from the definition of investment adviser, the question remains whether the Defendants' other activities bring them within the definition." *Terry's Tips*, 409 F.Supp.2d at 532; *cf. Lowe*, 472

U.S. at 204, 105 S.Ct. 2557 ("Congress did not intend to exclude publications that are distributed by investment advisers as a normal part of the business of servicing their clients."); *id.* at 208–09, 105 S.Ct. 2557 (holding that petitioners' newsletters satisfied the publishers exclusion because "they are published by those engaged *solely* in the publishing business and are not personal communications masquerading in the clothing of" the press) (emphasis added).

¶ 34 Second, defendants' lead trader service was not "bona fide" because it did not consist of *disinterested* commentary or analysis. To the contrary, each follower's investment decision was directly linked to Mandel's investment account. Thus, Mandel could personally benefit from his followers' decisions to mimic his investment decisions. *Cf. Lowe*, 472 U.S. at 209, 105 S.Ct. 2557 (concluding that petitioners satisfied the publishers exclusion because the SEC did not suggest that their publications "were designed to tout any security in which petitioners had an interest"). Therefore, the service does not satisfy section 11–51–201(9.5)(b)(II).

¶ 35 Third, the lead trader service was not "regular." The investment transactions (each of which constituted a unit of advice to the subscriber) did not follow a routine schedule. Instead, sporadic or specific market activity motivated Mandel's trading signals in the lead trader program, according to defendants' own advertisements for the service. *Cf. Lowe*, 472 U.S. at 209, 105 S.Ct. 2557 (recognizing that petitioners' publications were "regular" in the sense that they were *not* timed to specific market activity). Indeed, the SEC has considered a similar auto-trading service and concluded that the lead trader did not meet the federal act's publishers exclusion from investment adviser registration. *Weiss Research, Inc.*, 2006 WL 1725099, at *5. The SEC explained that the lead trader "was engaged in the business of advising others as to the buying and selling of securities *in response to market activity*" and "effectively had investment discretion to purchase and sell securities on behalf of its auto-

---

5. The controls offered by Ditto Trade do not alter the fact that a lead trader effectively has invest-

ment discretion over some or all of a follower's investment account.

trading subscribers." *Id.* (emphasis added). Consequently, defendants' service here did not enjoy the safe harbor of section 11–51–201(9.5)(b)(III).

¶ 36 In the end, because defendants' lead trader service did not qualify for the publishers exclusion—and thus was sufficiently personalized to require licensure—defendants' provision of this service for compensation without an investment adviser's license violated section 11–51–401(1.5).

### 2. Crystal Ball Readings

¶ 37 In the crystal ball readings, defendants directly responded to requests for advice about specific investment transactions. We assume without deciding that these responses qualified as "bona fide" and either "publications" or "newsletters" for purposes of section 11–51–201(9.5)(b)(II) and (III). Still, the record reveals that this paid service also failed to meet the publishers exclusion; so, the service was sufficiently personalized for regulation under the CSA.

¶ 38 Defendants' crystal ball service did not qualify as "regular." The communications arose from sporadic questions posed by individual subscribers based on specific market activity, using the ticker symbols of particular companies. And defendants offered answers in response to specific investment situations. For example:

- A subscriber e-mailed defendants, asking, "What are you advising your members to do regarding AFFY. Was there any news causing this drop?" Mandel responded: "No idea why it is so weak. But definitely a sell signal on the 15 minute chart. I sold out of my lead trader portfolio early this morning. If it bounces today, sell!"

- A subscriber wrote, "Also, I'm stuck in ISIS[.] I'm going to buy under 30 bucks somewhere and hope for a[n] upswing back to $32.00. Any advise

[sic] would be great here." Mandel told him: "Hold ISIS."

- A subscriber asked: "Would you buy, sell or hold EGHT?" Mandel replied: "EGHT—Great chart. Could pullback if market pulls back. Maybe sell half."

¶ 39 Because defendants' paid service consisted of direct responses to investment questions timed to specific market activity, the service was not regular within the meaning of the publishers exclusion.

### 3. Summary

¶ 40 According to the undisputed facts, defendants provided personalized investment advice to their subscribers by: (1) effectively executing discretionary securities trades on behalf of their clients as a lead trader on an auto-trading platform and (2) responding to direct investment questions from clients through a service called crystal ball readings. Under the circumstances of this case, the question whether defendants rooted their advice in a client's particular portfolio or specific investment needs is immaterial because that disputed fact does not affect the outcome. Because defendants provided these services for compensation without a license as investment advisers or investment adviser representatives, they violated section 11–51–401(1.5).

### E. The Constitutional Question

¶ 41 Recall that, in opposing the Commissioner's summary judgment motion, defendants asserted as an affirmative defense that the Federal Constitution and the Colorado Constitution barred this enforcement action. Defendants do not argue that the Colorado Constitution provides greater protections than the Federal Constitution on this point. And defendants focus on the First Amendment implications of regulating persons who issue financial newsletters or similar publications.[6]

---

6. Defendants ground their First Amendment claim in *Lowe*, which focused on the freedom of the press. Defendants rely on the Court's opinion, Justice White's concurrence in the result, and cases citing to his concurrence. Because defendants limit their constitutional contention to *Lowe* and its progeny, we limit our inquiry to the First Amendment concerns discussed in *Lowe*. We express no opinion on the First Amendment implications of a service like defendants' crystal ball readings that is offered without charge to questioners about whom the person answering the question has no knowledge.

¶ 42 Defendants maintain that, because the Commissioner did not "controvert" this affirmative defense in his summary judgment materials, the summary judgment must be set aside. But this argument fails because they do not identify any material factual dispute precluding resolution of the First Amendment issue on this record as a matter of law.

¶ 43 As discussed, Congress, when enacting the analogous Federal Investment Advisers Act, sought to regulate investment advice without infringing on the constitutional freedom of the press. Recognizing this intention, the Supreme Court in *Lowe* construed the federal act to comport with the First Amendment. Specifically, the Court interpreted the federal act's exclusion for bona fide publications in a way that accommodated these constitutional concerns. *See Lowe*, 472 U.S. at 190, 204, 211, 105 S.Ct. 2557.

¶ 44 Defendants cite no authority holding that regulating investment advisers within *Lowe*'s boundaries violates the First Amendment.[7] Nor have we found any. Therefore, because we have applied the CSA and its publishers exclusion consistently with *Lowe*'s analysis, application of the CSA to defendants under this analysis does not raise constitutional problems. Because defendants' services at issue were sufficiently personalized under *Lowe* to treat defendants as investment advisers or investment adviser representatives, requiring them to obtain a license as a condition of providing those services is constitutional.

¶ 45 For all of these reasons, we affirm the summary judgment in favor of the Commissioner.

### III. Restitution

¶ 46 After determining that defendants had violated the CSA, the trial court imposed restitution and a permanent injunction against them. They appeal both remedies. We first address restitution.

¶ 47 The Commissioner sought restitution in the form of subscribers' fees for enrollment in defendants' Lead Trader Membership Plan. He presented evidence of eighty such subscriptions, resulting in a total of $121,400 paid to defendants. The Commissioner eventually limited his restitution request to $80,000, reflecting $1000 for each of the Lead Trader Membership Plan subscribers. The Commissioner derived $1000 per subscriber from section 11–51–604(2.5), C.R.S. 2016, which provides in pertinent part:

> An investment adviser or investment adviser representative who violates section 11–51–401 is liable to each person to whom investment advisory services are provided in violation of such section in an amount equal to the greater of one thousand dollars or the value of all the benefits derived directly or indirectly from the relationship or dealings with such person prior to such time as the violation may be cured[.]

¶ 48 Defendants contend that the trial court erred by imposing restitution under section 11–51–604(2.5) because the Commissioner cannot rely on that provision in an enforcement action. We affirm the restitution order, albeit on somewhat different grounds from those employed by the trial court. *See People v. Chase*, 2013 COA 27, ¶ 17, —— P.3d —— ("[W]e may affirm a trial court's ruling on grounds different from those employed by that court, as long as they are supported by the record.").

### A. Standard of Review

¶ 49 We review de novo whether the trial court applied the correct legal standard when determining an equitable remedy. *Zeke Coffee, Inc. v. Pappas–Alstad P'ship*, 2015 COA 104, ¶ 11, 370 P.3d 261. The trial court has discretion, however, to decide the components of such a remedy, and we review such decisions for an abuse of discretion. *Id.* A court abuses its discretion if it bases its ruling on an erroneous view of the law or if its ruling is manifestly, arbitrarily, unreasonable, or unfair. *See Genova v. Longs Peak Emergency Physicians, P.C.*, 72 P.3d 454, 458–59 (Colo. App. 2003).

---

7. As mentioned, Justice White's opinion in *Lowe* discerned constitutional problems with the federal act because he adopted a different, narrower construction of the act. The Court, however, rejected his statutory interpretation.

## B. Analysis

¶ 50 The Commissioner may seek to impose monetary liability on an unlicensed investment adviser in addition to seeking injunctive relief. § 11–51–602(1)–(2). The Commissioner may include *"a claim for damages under section 11–51–604* or restitution, disgorgement, or other equitable relief on behalf of some or all of the persons injured by the act or practice constituting the subject matter of the action[.]" § 11–51–602(2) (emphasis added).

¶ 51 Although the trial court imposed restitution against defendants under section 11–51–604(2.5), defendants contend that the court erred nonetheless. They argue that section 11–51–602(2)'s reference to section 11–51–604 permits only an award of "damages" under the latter statute. Defendants observe that subsection (2.5) of section 11–51–604 differs from other subsections because it does not refer to the relief afforded therein as "damages." *Cf.* § 11–51–604(1).

¶ 52 Until at least 1998, section 11–51–602(2)'s reference to "damages under section 11–51–604" encompassed all the monetary relief mentioned in section 11–51–604. Each subsection of section 11–51–604 that discussed a type of monetary relief labeled the relief "damages." *See* § 11–51–604, C.R.S. 1997. In 1998, however, the General Assembly added subsection (2.5), which (as noted) does not refer to the relief it affords as "damages." *See* Ch. 177, sec. 18, § 11–51–604(2.5), 1998 Colo. Sess. Laws 564. But did the General Assembly thereby intend to prevent the Commissioner from employing section 11–51–604(2.5)?

¶ 53 This question is best saved for a case in which the answer affects the outcome. The answer does not alter the result here because section 11–51–602(2) and the trial court's findings support the $80,000 award under a common law restitution theory. Section 11–51–602(2) expressly authorizes the Commissioner to seek such relief. Restitution

is an equitable remedy that "restores a party to his/her prior status" and may be used "to deprive the defendant of benefits that in equity and good conscience he ought not to keep." *Zeke Coffee*, ¶ 13 (citations omitted).[8]

¶ 54 As discussed, the trial court found, and the record shows, that eighty subscribers enrolled in defendants' Lead Trader Membership Plan. Each subscription cost a minimum of $1000. Thus, defendants received a minimum of $80,000 by unlawfully providing investment advice without a license. Although defendants point out that the trial court did not find that they made false claims or that any subscriber suffered losses (or did not receive the services advertised), restitution is available "even though [defendant] may have received those benefits honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses." *Id.* (citation omitted).[9]

¶ 55 Accordingly, the record and the law support the restitution award.

## IV. Permanent Injunction

¶ 56 The trial court granted a permanent injunction against defendants. The injunction contains two operative parts. Defendants challenge both parts.

¶ 57 Part I(A) precludes defendants from "[a]ssociating in any capacity with any broker-dealer, sales representative, promoter, issuer, financial planner, investment adviser, or investment adviser representative engaged in business in Colorado, or any individual or entity engaged in the offer, purchase, or sale of securities in or from Colorado." The injunction defines the phrase "associating in any capacity" as:

> [A]cting as a broker-dealer, sales representative, promoter issuer, financial planner, investment adviser, investment adviser representative (or occupying a similar status or performing similar functions), or directly or indirectly controlling, acting as agent for, or exercising common control of

---

8. Because Colorado case law is on point, we need not look to *Van Zanen v. Qwest Wireless L.L.C.*, 522 F.3d 1127 (10th Cir. 2008), cited by defendants. In addition, that case predates *Zeke Coffee, Inc. v. Pappas–Alstad Partnership*, 2015 COA 104, 370 P.3d 261.

9. Although not a basis for our decision, we note that some of defendants' subscribers did complain that their auto-trading accounts suffered losses.

a broker dealer; sales representative, promoter, financial planner, or investment adviser, or any employee of a broker-dealer, sales representative, promoter, issuer, financial planner, or investment adviser.

¶ 58 Part I(B) essentially prohibits defendants from violating parts 3, 4, and 5 of the CSA. This part of the injunction closely tracks the language of section 11–51–301, C.R.S. 2016 (forbidding the sale of unregistered securities): sections 11–51–401 to –402 (barring doing business as broker-dealer, sales representative, investment adviser unless licensed or exempted); and section 11–51–501, C.R.S. 2016 (making it unlawful to commit fraud in connection with the offer, sale, or purchase of a security).

¶ 59 Defendants argue that Part I(A) improperly enjoins them from engaging in lawful activity, while Part I(B) is overbroad and vague. They further argue that the injunction impermissibly chills their First Amendment rights.

### A. Standard of Review

¶ 60 We review the trial court's order entering a permanent injunction for an abuse of discretion. *Stulp v. Schuman*, 2012 COA 144, ¶ 9, —— P.3d ——. We defer to the trial court's underlying factual findings if the record supports them. *Id.* We review de novo whether an injunction violates a constitutional right. *Evans v. Romer*, 854 P.2d 1270, 1275 (Colo. 1993). We also interpret statutory provisions de novo. *Shelby Res., LLC v. Wells Fargo Bank*, 160 P.3d 387, 389 (Colo. App. 2007).

### B. Part I(A): "Associating In Any Capacity"

¶ 61 Defendants contend that the trial court exceeded its statutory authority and otherwise abused its discretion by enjoining them from "associating in any capacity" with securities professionals engaged in business in Colorado.

### 1. Statutory Authority

¶ 62 According to defendants, the trial court could enjoin only the particular act or

practice that violated the CSA. Defendants are mistaken.

¶ 63 The General Assembly enacted the CSA to "protect investors and maintain public confidence in securities markets while avoiding unreasonable burdens on participants in capital markets." § 11–51–101(2). Because the CSA is remedial in nature, we must construe its provisions broadly to effectuate its remedial purpose. *Id.* Section 11–51–602(1) authorizes the trial court to enjoin violations of the CSA and to enforce compliance with it:

> Whenever it appears to the [Commissioner] upon sufficient evidence satisfactory to the [Commissioner] that any person has engaged in or is about to engage in any act or practice constituting a violation of any provision of this article or of any rule or order under this article, the [Commissioner] may apply to the district court of the city and county of Denver to temporarily restrain or preliminarily or permanently enjoin the act or practice in question *and to enforce compliance with this article or any rule or order under this article.*

(Emphasis added.)

¶ 64 Especially where the trial court finds that a defendant is likely to violate the CSA again, the court's broad authority under section 11–51–602(1) includes the power to enjoin the defendant from associating with securities professionals in order to enforce the defendant's future compliance with the law (e.g., to protect against the defendant's continued offering of unlicensed investment advice). *See Stulp*, ¶¶ 25–26 (construing a similarly worded provision in the Animal Control Act to authorize the trial court to permanently enjoin an unfit owner's ownership of livestock to ensure against future mistreatment). To conclude otherwise would unnecessarily hamstring a court's remedial power to prevent a person unqualified to present investment advice and who has violated section 11–51–401(1.5) from again skirting the CSA's provisions by operating in the shadow of another. We may not interpret the CSA in a manner that contradicts the legislature's intent to protect investors and maintain public confidence in securities markets. *See* § 11–51–101(2).

¶ 65 Defendants point out that section 11–51–602(1) provides additional remedies when a person has committed fraud as described in section 11–51–501: "the court may enter an order imposing such conditions on such person as the court deems appropriate." Contrary to defendants' view, however, this provision does not limit the trial court's injunctive authority in cases not involving fraud. Instead, the provision empowers a court to impose additional conditions on, for instance, a licensed investment adviser who has committed fraud (perhaps requiring the adviser to give up a power of attorney or otherwise restricting the adviser's ability to continue practicing).

¶ 66 Defendants also contend that the injunction violates section 11–51–410(1)(b), C.R.S. 2016. That statute authorizes the Commissioner to bar association with broker-dealers and investment advisers only upon finding a willful violation of the CSA. But that statute does not limit a *trial court's* authority to impose an injunction enforcing compliance with the CSA.

¶ 67 Consequently, the trial court possessed statutory authority to enjoin defendants from associating with securities professionals in order to ensure compliance with the CSA. We now turn to whether the court abused its discretion in exercising that authority.

### 2. Trial Court's Discretion

¶ 68 "An injunction is an extraordinary and discretionary equitable remedy" that is "intended to prevent future harm." *Bd. of Cty. Comm'rs v. Vandemoer*, 205 P.3d 423, 430 (Colo. App. 2008). Trial courts are vested with broad discretion to formulate the terms of injunctive relief. *Colo. Springs Bd. of Realtors, Inc. v. State*, 780 P.2d 494, 498 (Colo. 1989); *see also United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 323, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961) ("[T]he suit has been a futile exercise if the Government proves a violation but fails to secure a remedy adequate to redress it.").

¶ 69 The trial court found the following. Neither defendant was licensed as an investment adviser or investment adviser repre-sentative. In fact, when Mandel previously applied for a license, the Commissioner brought an enforcement action against him for failure to disclose material facts in his application. The enforcement action resulted in a stipulated consent order barring Mandel from acting as or associating with any Colorado licensed or "federal covered" investment adviser. Yet, Mandel created an online membership plan that included two separate vehicles offering personalized investment advice, contrary to the CSA.

¶ 70 Together, Mandel's prior and recent misconduct justified the trial court's concern that he, along with WSR, will attempt once again to offer personalized investment advice without a license or applicable exemption. And the court could reasonably foresee that such attempts may involve association with securities professionals. The injunction sensibly seeks to ensure defendants' compliance with the CSA by denying them a route to continue disseminating personalized investment advice without a license. Hence, the court's decision to enjoin defendants from "associating in any capacity" with securities professionals was not manifestly arbitrary, unreasonable, or unfair. *See Stulp*, ¶ 26.

¶ 71 As written, however, the injunction does not comply with C.R.C.P. 65(d). Under that rule, every injunction "shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." *See also Colo. Springs Bd. of Realtors*, 780 P.2d at 499 ("[A]n injunction prohibiting conduct must be sufficiently precise to enable the party subject to the equitable decree to conform its conduct to the requirements thereof."). But the injunction here does not define the terms "broker-dealer, sales representative, promoter, issuer, financial planner, investment adviser, or investment adviser representative." Presumably, the trial court intended to refer to definitions contained in the CSA; however, requiring defendants to refer to materials outside the injunction's four corners is improper. *See* C.R.C.P. 65(d). And the CSA does not appear to define "promoter." The injunction must define such important terms or omit them. *See Wunder*, ¶ 23 (finding an

injunction impermissibly vague where it failed to define "vacation or travel related services or products").

¶ 72 Furthermore, some of the terms lend themselves to very broad application. For example, the trial court's reasoning does not support an injunction barring Mandel from associating with or being employed by any issuer, which may include any entity that issues securities (depending on the definition of "issuer"). In addition, the court's findings do not reflect concerns about defendants' radio show or newsletter. Yet, depending on what "promoter" means, the injunction may prohibit Mandel from discussing securities on the radio or in the newsletter. The record does not show that the trial court intended such a sweeping ban. In fact, such a far-reaching injunction would raise constitutional concerns implicating defendants' First Amendment rights.

¶ 73 Therefore, we vacate the injunction as to Part I(A). On remand, the trial court, if it decides to enter a new injunction, shall define all operative terms in the injunction and shall narrow or eliminate any prohibitions related to "issuer" and "promoter." Additionally, the court shall clarify that the injunction does not prohibit defendants from participating in a radio show, publishing a newsletter with nonpersonalized investment advice, or using similar mediums of the press that do not disseminate personalized investment advice. *See Osborn & Caywood Ditch Co. v. Green*, 673 P.2d 380, 383 (Colo. App. 1983) (vacating an injunction as too broad and restrictive).

## C. Part I(B): Obey-the-Law Provisions

¶ 74 Defendants contend that Part I(B) of the injunction is nothing more than an edict to obey the law and, as a result, it is overbroad and vague. Defendants are right.

¶ 75 The Commissioner does not deny that Part I(B) is an "obey the law" injunction. And the Commissioner rightly acknowledges that "[i]njunctions that do no more than re-cite the law with which a party is to comply are generally too vague." For instance, in *Colorado Springs Board of Realtors*, our su-preme court considered a decree that "in effect simply prohibits the Board from violat-ing Colorado's antitrust laws." 780 P.2d at

499. The supreme court concluded that the "sweeping language of the decree does not sufficiently inform the Board of the steps it must take to avoid violations thereof." *Id.* The supreme court remanded for revisions to the decree to prohibit the specific violations the Board had committed. *Id.*

¶ 76 Other courts have agreed that an injunction essentially requiring a party to obey the law raises several concerns. *See United States v. La.-Pac. Corp.*, 682 F.Supp. 1141, 1167 (D. Colo. 1988). The Commissioner draws our attention to the Seventh Circuit's decision in *Equal Employment Opportunity Commission v. AutoZone, Inc.*, 707 F.3d 824, 842 (7th Cir. 2013), but that case cautioned that "a request for an obey-the-law injunc-tion must be evaluated with great care." Such a request raises vagueness concerns because, as discussed, an injunction must be "specific in terms" and "describe in reason-able detail ... the act or acts sought to be restrained." C.R.C.P. 65(d); *see AutoZone*, 707 F.3d at 841–42 (citing Fed. R. Civ. P. 65(d)). Additionally, an obey-the-law injunc-tion is enforceable by contempt motion, which may bypass the normal administrative or adjudicative processes required to estab-lish that a defendant has violated the law. *AutoZone*, 707 F.3d at 841; *cf. Sec. & Exch. Comm'n v. Smyth*, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005) ("This Circuit has held re-peatedly that 'obey the law' injunctions are unenforceable.").

¶ 77 To mitigate these concerns, the Sev-enth Circuit held that a court may impose an obey-the-law injunction only where "the evi-dence suggests that the proven illegal con-duct may be resumed" and, even then, only with a temporal limit. *AutoZone*, 707 F.3d at 842, 844.

¶ 78 To recap, our supreme court's decision in *Colorado Springs Board of Realtors* casts doubt on a Colorado court's authority to impose an obey-the-law injunc-tion under any circumstances. Even assum-ing that a court may enter such an order in some cases, however, the obey-the-law in-junction must at least satisfy the Seventh Circuit's conditions the Commissioner cites. The injunction here does not.

¶ 79 First, the obey-the-law injunction contains no temporal limit. The injunction permits a contempt proceeding "no matter how remote in time or different from the violation proven in this case" and may "indefinitely deny [defendants] the protections of the normal administrative and adjudicative processes" attendant to proving a law violation. *AutoZone,* 707 F.3d at 844.[10]

¶ 80 Second, similar to the obey-the-law decree overturned in *Colorado Springs Board of Realtors,* 780 P.2d at 499, most of Part I(B) does not address the violations actually proved in this case. Rather, Part I(B) requires compliance with CSA provisions not at issue here.

¶ 81 Third, the only fragment of Part I(B) addressing the unlawful conduct proved in this case—the portion of Part I(B)(ii) forbidding defendants from acting as investment advisers or investment advisor representatives in violation of the CSA—does not clearly proscribe conduct not already prohibited by Part I(A). We cannot uphold a presumptively suspect obey-the-law injunction that appears to be of little use or whose use is too nebulous to decipher. The fact that this case involves a securities law violation does not give a court unbridled authority to impose an obey-the-law injunction. *See Smyth,* 420 F.3d at 1233 n.14; *Sec. & Exch. Comm'n v. Tourre,* 4 F.Supp.3d 579, 598 (S.D.N.Y. 2014) ("[T]he Court is skeptical of the utility of this kind of 'obey-the-law' injunction—after all, everyone is required to obey the law, the law comes with its own penalties, and merely reciting statutory provisions gives an individual 'little guidance on how to conform his conduct to the terms of the injunction.' ") (citation omitted).[11] We therefore reverse Part I(B) of the injunction.

### D. Summary and Remand Directions

¶ 82 Part I(A) of the permanent injunction is vacated, and Part I(B) is reversed. We remand for modification of Part I(A) at the trial court's discretion. If the trial court elects to impose a new injunction, it shall define all operative terms and otherwise comply with the discussion herein. The court need not take additional evidence.

### V. Conclusion

¶ 83 The summary judgment and restitution order are affirmed. The injunction is vacated in part and reversed in part, and the case is remanded to the trial court for further proceedings.

JUDGE WEBB and JUDGE HAWTHORNE concur.

10. The need for a temporal limit in an obey-the-law injunction derives from an obey-the-law injunction's suspect nature and our duty to scrutinize such an injunction with great care. We do not hold that a temporal limit must apply to other types of injunctions issued under the Colorado Securities Act, §§ 11-51-101 to -908, C.R.S. 2016, (e.g., Part I(A) of the trial court's injunction in this case).

11. True, the division in *Black Diamond Fund, LLLP v. Joseph,* 211 P.3d 727, 738 (Colo. App. 2009), upheld the Commissioner's cease and desist order requiring the respondents to comply with Colorado law. The respondents, however, argued only that the sanction was arbitrary and capricious because the Commissioner had not identified whether the sanction served the public interest. *Id.* The division rejected that argument but did not address whether the order was too vague or overbroad in duration.